**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN DOE 1, individually and as representative of his deceased father JOHN DOE 2; JANE DOE 1, individually and as representative of her deceased mother JANE DOE 2; JOHN DOE 3, individually and as representative of his deceased brother JOHN DOE 4; JANE DOE 3, individually and as representative of her deceased husband JOHN DOE 5; MINOR DOES 1–4, by and through their guardian JOHN DOE 6, individually and as representative of their deceased mother JANE DOE 4; JOHN DOE 7, individually and as representative of his deceased son JOHN DOE 8; JANE DOE 5, individually and as representative of her deceased husband JOHN DOE 9; JANE DOE 6, individually and as representative of her deceased husband JOHN DOE 10; JANE DOE 7, individually and as representative of her deceased husband JOHN DOE 11,

All available through counsel EarthRights International, 1612 K Street NW #401, Washington, DC 20006,[1]

*Plaintiffs,*

v.

Carla A. Hills, Personal Representative of the Estate of Roderick M. Hills

*Defendant*

**CLASS ACTION COMPLAINT FOR DAMAGES**

Civil Action No. _____.

1.  EXTRAJUDICIAL KILLING
2.  CRIMES AGAINST HUMANITY
3.  TORTURE
4.  WAR CRIMES
5.  TERRORISM
6.  MATERIAL SUPPORT TO TERRORIST ORGANIZATIONS
7.  CRUEL, INHUMAN, OR DEGRADING TREATMENT
8.  VIOLATION OF THE RIGHTS TO LIFE, LIBERTY AND SECURITY OF PERSON AND PEACEFUL ASSEMBLY AND ASSOCIATION
9.  CONSISTENT PATTERN OF GROSS VIOLATIONS OF HUMAN RIGHTS
10. WRONGFUL DEATH
11. ASSAULT AND BATTERY
12. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
13. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
14. NEGLIGENCE/NEGLIGENT HIRING/ NEGLIGENCE PER SE
15. LOSS OF CONSORTIUM

---

[1] The residence addresses of the individual Plaintiffs cannot be made public due to the substantial risk of violent reprisals against them.

**TABLE OF CONTENTS**

I.      SUMMARY OF THE COMPLAINT ................................................................................. 1

II.     JURISDICTION ............................................................................................................... 1

III.    PARTIES ........................................................................................................................ 2

IV.   NON-PARTIES OF INTEREST ..................................................................................... 3

V.     STATEMENT OF FACTS .............................................................................................. 7

      A.  Chiquita supported paramilitary terrorists in the Colombian conflict ..........................7

      B.  The *convivir* were created to legitimize and provide support to the paramilitaries .....11

      C.  The AUC acted under color of authority of the Colombian government in
          committing the Acts alleged herein ..........................................................................13

          i.    The AUC and other paramilitary groups were found with the cooperation
              of the Colombian Government, and were assigned by the Government to
              combat left-wing guerillas using methods that included using violence
              against civilians and unions ............................................................................13

          ii.   The AUC consistently operated in Urabá with the cooperation,
              coordination, and assistance of the Colombian Government when
              attacking civilians ..........................................................................................17

          iii.  The AUC took on numerous State functions in Urabá, including the
              maintenance of security and order, the disposition of personal and
              commercial disputes, the provision and regulation of social services, and
              the imposition of social rules...........................................................................20

      D.  Chiquita supported the AUC in Urabá.......................................................................21

          i.    Chiquita regularly made payments to the AUC................................................22

          ii.   Chiquita facilitated the AUC's arm shipments .................................................29

          iii.  Chiquita facilitated the AUC's drug shipments ................................................31

      E.  Chiquita's conduct aided and abetted the AUC's conduct alleged herein.................31

          i.    Chiquita substantially assisted the persons who personally committed the
              acts comprising Plaintiffs' claims...................................................................32

          ii.   Chiquita knew and intended that its actions would assist in the illegal or
              wrongful activity at the time it provided assistance............................................32

F.   Chiquita joined the AUC's conspiracy to commit the acts alleged herein ..................37

i.   Members of the AUC agreed to fight the FARC by means of illegal violence against particular classes of civilians, thereby constituting a conspiracy of two or more persons who agreed to commit a wrongful act ........38

ii.   Chiquita joined the conspiracy knowing that the AUC intended to fight the FARC by means of illegal violence against particular classes of civilians, and intending to help accomplish that goal ..........................................38

iii.   The AUC's conduct alleged herein was committed by members of the AUC in furtherance of the conspiracy's goal of fighting the FARC by means of illegal violence against particular classes of civilians ........................39

G.   The AUC acted as Chiquita's agent in committing the acts alleged herein ................39

VI.   PLAINTIFFS' INJURIES ....................................................................................................41

VII.   GENERAL ALLEGATIONS ..............................................................................................46

VIII.   CLASS ACTIONS ALLEGATIONS ..................................................................................49

IX.   CLAIMS FOR RELIEF ......................................................................................................54

A.   First claim for relief – war crimes ..................................................................................54

i.   The civil war in Colombia is an armed conflict within the meaning of the laws of war ........................................................................................................55

ii.   The AUC was a party to the armed conflict in Colombia ................................56

iii.   Plaintiffs did not take active part in the hostilities. ........................................56

iv.   Plaintiffs were killed in the course of armed conflict ......................................57

B.   Second claim for relief – crimes against humanity ........................................................58

i.   The killings alleged herein were part of a widespread and systematic attack ..................................................................................................................58

ii.   The killings alleged herein were part of an attack that was directed against a civilian population ............................................................................59

C.   Third claim for relief - terrorism ....................................................................................60

i.   The killings alleged herein were committed in order to coerce or intimidate the civilian population of Urabá ....................................................60

ii. The killings alleged herein were committed in order to coerce or intimidate the civilian population of Urabá and Colombia at large from supporting the FARC ...................................................................60

D. Fourth claim for relief – material support to terrorist organization ............................61

i. Chiquita, the Decedent, and the Non-Party Executives provided asserts to the AUC in the form of money, arms and logistical support ......................62

ii. The AUC was at all relevant times a terrorist organization ...........................62

iii. Chiquita knew and intended that the support it provided to the AUC would be used to carry out attacks on the civilian population of Urabá for the purposes of intimidating that population ...............................................63

E. Fifth claim for relief – extrajudicial killing ...............................................................63

i. The AUC's killings were carried out deliberately as part of the role assigned to them by the Colombian State to repress support of the FARC, but unauthorized by a judgment pronounced by any court ................64

F. Sixth claim for relief - torture ...................................................................................65

i. The AUC caused Plaintiffs and their decedents to suffer severe mental and physical pain and suffering ..................................................................65

ii. The AUC tortured Plaintiffs and decedents as part of the role assigned to them by the Colombian State, to intimate and deter them from supporting the FARC ......................................................................................66

G. Seventh claim for relief – cruel, inhuman, or degrading treatment ...........................66

i. The AUC inflicted mental and physical suffering, anguish, humiliation, fear and debasement on Plaintiffs and their decedents as part of the role assigned to them by the Colombian State, to intimate and coerce civilians from supporting the FARC.............................................................67

H. Eighth claim for relief – violation of the rights to life, liberty, and security of person and peaceful assembly and association ..........................................................68

i. Members of the AUC, as State agents and at the behest of State agents, carried out a systematic campaign of terror and violence...............................69

ii. The AUC's campaign was hatched and calculated to suppress any political activity or expression that could be suspected of association with support for the FARC ............................................................................69

iv

I.   Ninth claim for relief – consistent pattern of gross violations of internationally
     recognized human rights ........................................................................................69

     i.    The AUC committed to acts of abuse against Plaintiffs and their
           decedents in the context of a consistent pattern of abuses ..............................70

J.   Tenth claim for relief – wrongful death ..................................................................71

     i.    The AUC caused decedents' deaths as a result of its overt acts of killing .....71

     ii.   If decedents had not died, they would have been able to maintain an
           action for damages resulting from their injuries ..............................................72

K.   Eleventh claim for relief – assault and battery ........................................................72

     i.    Members of the AUC attacked decedents intending to cause decedents
           to suffer harmful contacts or an imminent apprehension of an immediate
           harmful conduct without their consent ............................................................73

     ii.   Decedents suffered harmful conducts or a reasonable, imminent
           apprehension of harmful contacts because of the AUC's attacks ...................73

L.   Twelfth claim for relief – intentional infliction of emotional distress ........................73

     i.    Chiquita, the Decedent, and Non-Party Executives acted intentionally
           and recklessly, with the intent and/or deliberate disregard of the high
           possibility that their support, assistance, direction, and collusion with the
           AUC would cause the acts alleged herein and cause severe humiliation,
           mental anguish, and emotional and physical duress. .....................................74

     ii.   Chiquita, the Decedent, and Non-Party Executives' conduct was so
           outrageous in character and so extreme in degree, as to go beyond all
           possible bounds of decency, and to be regarded as atrocious and utterly
           intolerable in a civilized community, and was without privilege or
           justification ....................................................................................................75

     iii.  Chiquita, the Decedent, and Non-Party Executives' actions in aiding,
           facilitating, paying, colluding with, and supporting the AUC caused the
           Plaintiffs' and their decedents' duress ...........................................................75

     iv.   The distress suffered by Plaintiffs is severe enough that no reasonable
           person would be expected to endure it ............................................................76

M.   Thirteenth claim for relief – Negligent Infliction of Emotional Distress

     i.    Chiquita, the Decedent, and Non-Party Executives breached their duty
           to the Plaintiffs by failing to act so as to stop engaging in the conduct

described herein, and by failing to take steps in their power to prevent or prohibit such conduct ...................................................................................77

ii.     Chiquita, the Decedent, and Non-Party Executives' conduct alleged herein proximately caused Plaintiffs and decedents to suffer emotional distress so severe that no reasonable person could be expected to endure it ...............................................................................................................78

iii.    At all relevant times, Chiquita, the Decedent, and Non-Party Executives knew that their conduct would and did proximately result in physical and emotional distress to the AUC's victims...................................................78

iv.     Plaintiffs' and decedents' distress was genuine and substantial....................79

N. Fourteenth claim for relief – negligence/negligent hiring/negligence per se .............80

i.      Chiquita, the Decedent, and Non-Party Executives breached their duty to Plaintiffs by failing to act so as to stop engaging in conduct described herein, and by failing to take steps in their power to prevent or prohibit such conduct Chiquita, the Decedent, and Non-Party Executives' ................80

ii.     Chiquita, the Decedent, and Non-Party Executives' conduct alleged herein proximately caused Plaintiffs and decedents to suffer physical and emotional harm, including death..............................................................81

iii.    At all relevant times, Chiquita, the Decedent, and Non-Party Executives knew that the AUC was an organization dedicated to the use of terrorism and violence against civilians and that it would use violence against perceived opponents of Chiquita, and could have foreseen that this could and would cause physical and mental harm to the AUC's victims.................81

iv.     The AUC's dedication to the use of terrorism and violence against civilians proximately caused Plaintiffs' and decedents' injuries....................82

v.      Chiquita, the Decedent, and Non-Party Executives' acts of material support to the AUC, along with its acts of assistance, support, direction, and collusion, violated laws designed to protect Plaintiffs and decedents, the violation of which constitutes negligence per se .......................................83

O. Fifteenth claim for relief – loss of consortium...........................................................83

i.      As a result of the murders of decedents by the AUC, Plaintiffs were deprived of their spouses', parents', and children's society, companionship, services, and support .........................................................84

X.      PRAYER FOR RELIEF ........................................................................................85

XI.     JURY TRIAL DEMAND .......................................................................................85

vi

XII.    VERIFICATION..........................................................................................................85

# I. SUMMARY OF THE COMPLAINT

1.      This case arises as a result of the actions of Chiquita Brands International, Inc., and its subsidiaries and affiliates (collectively, "Chiquita"), in funding, arming, and otherwise supporting terrorist organizations in Colombia in their campaign of terror against the civilian population of the Urabá region, in order to maintain its profitable control of Colombia's banana growing regions. Plaintiffs are family members of trade unionists, banana workers, political organizers, social activists, and others targeted and killed by terrorists, most notably the paramilitary organization United Self-Defense Groups of Colombia (*Autodefensorias Unidas de Colombia*, or AUC), between 1995 and 2004. In order to produce bananas in an environment free from labor opposition and social disturbances, Chiquita, the decedent Roderick M. Hills, and other non-party individuals funded, armed, and otherwise supported the AUC.  The deaths of Plaintiffs' relatives were a direct, foreseeable, and intended result of Chiquita's illegal and tortious support of terrorist organizations. Chiquita, Mr. Hills, and non-parties' actions violated not only Colombian law and U.S. law, but also customary international law prohibiting crimes against humanity, extrajudicial killing, torture, war crimes, and other abuses.

## II.    JURISDICTION

2.      The Court has jurisdiction over this case under 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1350 (Alien Tort Claims Act); and 28 U.S.C. § 1332 (diversity jurisdiction). The amount in controversy for each Plaintiff exceeds $75,000, and the action is between citizens of a State and citizens or subjects of a foreign state.

**3.**     In addition, Plaintiffs invoke the supplemental jurisdiction of this Court with respect to claims based upon laws of the State of New Jersey, the District of Columbia, or any other applicable jurisdiction pursuant to 28 U.S.C. § 1367.

### III.   PARTIES

4.      The term "Plaintiffs" herein includes the named plaintiffs and the decedents on behalf of whom they bring this action.

5.      Plaintiff John Doe 1 is a resident and citizen of Colombia. He brings this action individually and as representative of his deceased father, John Doe 2.

6.      Plaintiff Jane Doe 1 is a resident and citizen of Colombia. She brings this action individually and as representative of her deceased mother, Jane Doe 2.

7.      Plaintiff John Doe 3 is a resident and citizen of Colombia. He brings this action individually and as representative of his deceased brother, John Doe 4.

8.      Plaintiff Jane Doe 3 is a resident and citizen of Colombia. She brings this action individually and as representative of her deceased husband, John Doe 5.

9.      Minor Does 1–4 are residents and citizens of Colombia. They are all minor children, who prosecute this action by and through their guardian John Doe 6. They bring this action individually and as representatives of their deceased mother, Jane Doe 4.

10.     Plaintiff John Doe 7 is a resident and citizen of Colombia. He brings this action individually and as representative of his deceased son, John Doe 8.

11.     Plaintiff Jane Doe 5 is a resident and citizen of Colombia.  She brings this action individually and as representative of her deceased husband, John Doe 9.

12.     Plaintiff Jane Doe 6 is a resident and citizen of Colombia.  She brings this action individually and as representative of her deceased husband, John Doe 10.

13.     Plaintiff Jane Doe 7 is a resident and citizen of Colombia.  She brings this action individually and as representative of her deceased husband, John Doe 11.

14.     The Defendant, Carla A. Hills, is the wife of the late Roderick M. Hills (hereinafter "the

Decedent"), the former Chiquita Director and President of the Audit Committee. Upon information and belief, the individual previously designated in the Factual Proffer as Individual B is now known to be the Decedent.[2] The Decedent knew of Chiquita's payments to the AUC and reviewed and authorized these payments. The Decedent implemented new procedures to hide payments to the AUC. The Decedent instructed Chiquita employees to continue making payments after learning that the payments were illegal. Because Plaintiffs' claims against the Decedent were not extinguished by his death, Plaintiffs now proceed against the Defendant, who, as Personal Representative of the estate of the Decedent, will be required to satisfy any judgment rendered against the estate for the Decedent's tortious conduct.[3]

## IV.   NON-PARTIES OF INTEREST[4]

15.     Chiquita Brands International, Inc. ("CBI" or "Chiquita"), is a United States-based corporation organized under the laws of the State of New Jersey. Its corporate headquarters are located in Cincinnati, Ohio. CBI is a leading international producer, distributor, and marketer of bananas and other produce; it is one of the largest banana producers in the world and a major supplier of bananas to Europe and North America. The company was founded in 1899 as the

---

[2] Chiquita submitted the Factual Proffer in 2007 in support for its guilty plea in the U.S. government's criminal prosecution of the company. In that case, Chiquita agreed to plead guilty to the felony of engaging in transactions with a Specially-Designated Terrorist Group (the AUC). As a basis for its guilty plea, Chiquita admitted as true the facts set out in the Factual Proffer.

[3] The Decedent, along with Chiquita Brands International, Inc., Cyrus Freidheim, Jr., Robert Olson, Robert Kistinger, Charles Keiser, and William Tsacalis are named defendants in the active multidistrict litigation, *In re Chiquita Brands Int'l, Inc., Alien Tort Statute & Shareholder Derivative Litigation*, 792 F. Supp. 2d 1301 (S.D. Fla. 2011) ("*Chiquita* MDL"). On June 1, 2015, Carla A. Hills, as Personal Representative of the Decedent's estate, was substituted as an individual defendant in two cases in the MDL, including the Plaintiffs', *John Doe et al. v. Chiquita Brands Int'l et al.*, No. 08-80421 (S.D. Fla.). To ensure that any future judgment against Mrs. Hills/the Decedent would be enforceable against the Decedent's estate, Plaintiffs filed a creditor's claim in D.C. Superior Court's Probate Division, which Mrs. Hills disallowed on July 23, 2015. The D.C. Probate Code requires that following a disallowance, a claim be filed in the D.C. Superior Court of another court of competent jurisdiction. Although Plaintiffs believe that their existing complaint against Chiquita and others fulfills this requirement, out of an abundance of caution, Plaintiffs submit this Complaint, which has been modified to name only Carla Hills as the Defendant.

[4] While not designated as individual defendants in this Complaint, the listed non-parties are among the defendants in the *Chiquita* MDL.

United Fruit Company, became the United Brands Company in 1970, and changed its name to Chiquita Brands International in 1990.

16.     On information and belief, at all times relevant herein, CBI wholly owned, dominated and controlled C.I. Bananos de Exportación, S.A. ("Banadex"), headquartered in Medellín, Colombia.  At all relevant times, Banadex produced bananas in the Urabá and Santa Marta regions of northeastern Colombia and, by 2003, was Chiquita's most profitable banana-producing operation globally.  At all times material herein, Banadex was an agent, alter ego, co-conspirator, and joint tortfeasor with CBI, with whom it cooperated in a joint criminal enterprise.

17.     Upon information and belief, the individual designated in the Factual Proffer as Individual A is now known to be Cyrus Freidheim, Jr., former Chairman of the Board of Directors and former CEO of Chiquita. Freidheim knew of Chiquita's payments to the AUC and reviewed and authorized these payments.

18.     Upon information and belief, the individual designated in the Factual Proffer as Individual C is now known to be Robert Olson, former Vice President and General Counsel of Chiquita. Olson knew of Chiquita's payments to the AUC and reviewed and authorized these payments. Olson also reviewed and approved new procedures to hide payments to the AUC.

19.     Upon Information and belief, the individual designated in the Factual Proffer as Individual D is now known to be Robert Kistinger, former President and COO of Chiquita Fresh Group. Kistinger knew of Chiquita's payments to the AUC and reviewed and authorized these payments. Kistinger instructed Chiquita employees to continue making payments after learning that the payments were illegal.

20.     Charles Keiser, manager of Chiquita's operations in Colombia, personally met with leaders of the AUC to initiate payments and, later, to arrange a system to hide Chiquita's

payments to the AUC.

21.     William Tsacalis, Controller and Chief Accounting Officer for Chiquita, knew about Chiquita's payments to convivrs and the AUC and designed the new procedures for payments to the AUC after it was designated as a Foreign Terrorist Organization.

22.     Tsacalis, Keiser, Kistinger, Olson, and Freidheim, when referred to herein collectively, will henceforth be designated "the Non-party Executives."

23.     Plaintiffs are ignorant of the true names and capacities of the individuals referred to herein as Moes 11 and 12.

24.     The alleged Moe 11 is a high-ranking officer of Banadex designated in the Factual Proffer as Individual F.

25.     The alleged Moe 12 is a Banadex employee designated in the Factual Proffer as Individual G.

26.     Plaintiffs are informed and believe, and on that basis allege, that the Defendant and each fictitiously named Non-Party is responsible in some manner for the occurrences herein alleged and that the injuries to Plaintiffs herein alleged were proximately caused by the conduct of such Non-parties, in that each caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, or aided and abetted the injuries complained of, and/or was the principal, employer, or other legally responsible person for the persons who caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, and/or aided and abetted such injuries. Whenever and wherever reference is made in this Complaint to any conduct committed by Chiquita, CBI, and/or Banadex, such allegations and references shall also be deemed to mean the conduct of CBI and Banadex, acting individually, jointly and severally, through personnel working in the United States and Colombia for the

benefit of CBI and Banadex.

27.     At all times herein material, with respect to the events at issue, Chiquita, Banadex, the

Decedent, Non-party Executives, Moes 11 and 12 conspired with each other, and/or participated

in a joint criminal enterprise with each other, and/or acted in concert, and/or aided or abetted

each others' actions, and/or were in an agency or alter ego or joint venture relationship, and were

acting within the course and scope of such conspiracy, joint criminal enterprise, concerted

activity, aiding and abetting, and/or agency or alter ego or joint venture relationship. As

described herein, "agency" includes agency by ratification. Whenever reference is made in this

Complaint to any conduct by Chiquita, the Decedent, or any of the Non-party Executives, ,such

allegations and references shall be construed to mean the conduct of each of the abovenamed,

acting individually, jointly, and severally.

28.     At all times herein material, with respect to the events at issue, Chiquita conspired with,

worked in concert with, participated in a joint criminal enterprise with, acted as the principal of,

employed, and/or aided and abetted the violent terrorist organizations responsible for Plaintiffs'

injuries, including but not limited to the AUC.  These terrorist organizations were acting within

the course and scope of such agency, employment, and/or concerted activity. The wrongful

conduct alleged herein was perpetrated by Chiquita management and personnel, including the

Decedent, both in Colombia and the United States.

**29.**     Plaintiffs are informed and believe and based upon such information and belief allege that

CBI management and other personnel in the United States and in Colombia including the

Decedent, Freidheim, Olson, Kistinger, Keiser and Tsacalis were informed of the ongoing events

complained of herein and participated in the decision making, planning, preparation, ratification,

and/or execution of the acts complained of.

## V.    STATEMENT OF FACTS

### A.  Chiquita Supported Paramilitary Terrorists in the Colombian Conflict.

30.     Chiquita supported terrorist groups in Colombia by paying them and assisting them to obtain arms and smuggle drugs.  Chiquita knew that these groups used illegal violence against civilians and intended that they employ this strategy to quell social and labor unrest in the Northeast Colombian region of Urabá and safeguard the stability and profitability of Chiquita's enterprises in Colombia.

31.     Among the terrorist organizations that Chiquita supported were two paramilitary groups, the Rural Self-Defense Group of Córdoba and Urabá (*Autodefensas Campesinas de Córdoba and Urabá*, or ACCU) and its successor and parent, the United Self-Defense Groups of Colombia (*Autodefensas Unidas de Colombia*, or AUC).  Whenever reference is made in this Complaint to the AUC, such references shall be construed to mean the AUC, the ACCU, and any other predecessor or constituent part of the AUC.

32.     These paramilitaries operated in the banana-growing region of Urabá, an area located in the northeast corner of Colombia and South America, within the Department of Antioquia.

33.     Before the 1960s, the Urabá region was lightly populated, mostly by indigenous communities, and remained isolated from the central government.  The United Fruit Company, the predecessor to Chiquita, expanded to the Urabá region in the early 1960s and created a Colombian subsidiary, Banadex, which produced about ten percent of the region's bananas. Many workers migrated to the region as the banana industry grew.

34.     In the 1980s, two leftist, anti-government guerrilla groups, the Revolutionary Armed Forces of Colombia (*Fuerzas Armadas Revolucionarios de Colombia*, or FARC) and the National Liberation Army (*Ejercito Nacional de Liberacion*, or ELN), became active in Urabá.

7

35.     The paramilitaries were originally legally sanctioned "self-defense groups," authorized by a 1968 Colombian law to assist in the fight against the anti-government guerrillas, including the FARC and the ELN.  By 1991, however, the level of extrajudicial violence in which paramilitaries were implicated had become so great that the Colombian government adopted a new law criminalizing membership in and provision of support to the paramilitary groups.

36.     Over the course of the 1980s, the paramilitaries maintained strong ties to the Colombian government and increasingly worked for and with powerful private groups that were opposed by the leftist guerrillas, including businesses, industrialists, large landowners, and bankers.  They also became deeply involved in the drug trade, which gave them a steady source of income to procure arms.  As a result, and despite the official criminalization of the paramilitaries, they became a central component of the government's strategy to win the civil war.  At all times relevant to this complaint, the AUC and other paramilitary groups in fact collaborated closely with the Colombian government and were used by the government to oppose anti-government guerrilla groups like the FARC.  *See infra* ¶¶45–66.  The AUC's efforts were directed toward the elimination of guerrillas and destroying the suspected bases of guerrilla support.  In that effort, they were supported by banana companies like Chiquita, who benefited directly from the suppression of suspected guerrilla sympathizers, such as labor union leaders.

37.     In the early 1990s, the largest and most well-organized paramilitary group in Colombia was the ACCU.  The organization was distinguished by its central command, which coordinated the activities of local subdivisions, known as "blocs" and "fronts."  Both mobile and stationary units existed, and fighters received a base salary and food, a uniform, weapons, and munitions.  The commander-in-chief of the ACCU was Carlos Castaño, a long-time paramilitary fighter with family ties to the drug trade.  In 1997, Castaño and the ACCU sponsored a summit of the Self-

Defense Groups of Colombia, bringing together regional paramilitaries from across the country. This summit led to the formation of the AUC, a national federation uniting Colombia's regional paramilitaries under Castaño's leadership.  At all times relevant to this Complaint, Castaño remained the leader of the AUC.

38.     The AUC grew rapidly in size during the late 1990s and into the twenty-first century.  In 1997, it comprised roughly 4,000 combatants.  By 2001, Castaño claimed that the AUC had 11,000 members, though government estimates put the number somewhere between 8,000 and 9,000. By 2002, AUC forces were present throughout Colombia.  AUC leaders have claimed that, at the time the process of demobilization began in 2004, the organization included as many as 17,000 armed fighters and 10,000 other associates, including informants, cooks, drivers, and computer technicians.

39.     In order to undermine communities' and individuals' support for the guerillas, the AUC and its constituent groups, including the ACCU, adopted a strategy of terrorism, routinely engaging in death threats, extrajudicial killings, attacks on civilian populations, torture, rape, kidnapping, forced disappearances, and looting.

40.     While the AUC periodically engaged in direct combat with armed guerrilla forces, the vast majority of its victims were civilians.  The AUC claimed that it was justified in targeting civilians with no known ties to guerrillas because guerrilla groups required the logistical support of local towns in order to operate in the region. Carlos Castaño, the AUC leader, described this strategy as "quitarle agua al pez" (draining the water to catch the fish), as the AUC sought to intimidate and coerce civilians to prevent them from providing support to guerrillas.  Inhabitants of small towns in contested rural areas were particularly vulnerable to AUC attack.  AUC violence often caused entire communities to disperse, either due to threats of an impending

massacre or in the wake of such massacres and the looting and destruction that commonly accompanied them.

41.     The AUC also targeted anyone considered to share the guerrillas' leftist ideology, such as teachers, community leaders and activists, trade unionists, human rights defenders, religious workers, and leftist politicians.  The banana companies shared the AUC's opposition to these individuals and organizations.  As part of its efforts to completely dominate the social and political life of the regions it controlled, the AUC also targeted anyone considered socially undesirable, including indigenous persons, persons with disabilities, persons with psychological problems, drug addicts, prostitutes, and suspected petty criminals.

42.     The abuses of the AUC and its constituent groups, including the ACCU, covered a large area, affected a large population, and were carried out according to a systematic and well-coordinated plan between the government, the paramilitaries, and the companies that financed them.  These groups operated throughout the banana-growing region of Urabá, as well as in other parts of Colombia.  On many occasions from at least 1994 through 2004, they carried out multiple executions or mass-killings of civilians; by 1997, the ACCU and other AUC groups were already responsible for at least 150 such instances of mass-killings. From its founding, the AUC's activities and abuses have been carried out under the direction of a central command.

43.     At all times relevant to this complaint, the AUC and its constituent groups, including the ACCU, participated in an internal armed conflict in Colombia, in which the paramilitaries were fighting on behalf of the government against guerrilla forces.

44.     The AUC was subdivided into two blocs in Urabá, the Banana Bloc and the Elmer Cárdenas Bloc. While there had been paramilitaries under the control of the Castaño family in Urabá since the 1980s, the Banana Bloc was formally created in Urabá in 1994.  José Ever

Veloza García – a.k.a. "H.H." – was selected as one of the first commanders.  In later years, the Banana Bloc operated through two fronts: the Turbo Front in Northern Urabá, under the command of H.H., and the Banana Front in the south, led by Raúl Hasbún.

45.     The Elmer Cárdenas Bloc began as a private defense group that united with the ACCU in 1995.  It was commanded by Freddy Rendón Herrera – a.k.a. "El Alemán" – and Elmer Cárdenas until Cárdenas was killed by the guerrillas in 1997.  The Elmer Cárdenas Bloc also received men, training, and assistance from the Banana Bloc.  Both blocs received funding from the banana companies, including Chiquita, directly or through the *Convivir* Papagayo.  *See infra* ¶¶37–44 (*convivir*).

### B. The *Convivir* Were Created to Legitimize and Provide Support to the Paramilitaries.

46.     Although paramilitarism had been declared illegal in Colombia, the Colombian government still needed the paramilitaries to assist in the armed conflict against the guerillas; Decree 356 of 1994 was therefore enacted as a new legal mechanism to provide cover and a legitimate avenue of funding for the AUC.  Paramilitaries could easily reorganize and continue operating under Chapter 5 of this Decree, which allowed for the authorization of private groups to provide "Special Vigilance and Private Security Services."  These security groups, known commonly by their Spanish-language acronym "CONVIVIR," consisted of civilians who received a license from the government to "provide their own security. . . in areas of high risk or in the public interest, which requires a high level of security."  *Convivir* were permitted to use arms that were otherwise restricted to military use.

47.     The *convivir* units in Urabá were fronts for the AUC from their inception.  Many were directed and populated by known paramilitaries; this was common knowledge in the region.  As

11

H.H. once remarked publicly, "Let us not deceive ourselves: all the *convivir* were ours." The 17th Brigade of the Colombian Armed Forces, which was infamous for its close collaboration with the paramilitaries in Urabá, was given the authority to select members of the *convivir* in Urabá. *See infra* ¶¶56–61, 64–65 (describing the close collaboration between the 17th Brigade and the paramilitaries).

48.     Álvaro Uribe, the current President of Colombia, was governor of Antioquia at the time of the creation of the *convivir*. Uribe authorized the funding, arming, and funneling of information to the *convivir*, thereby facilitating the sharing of such funds, arms, and information with the AUC. Uribe expected the *convivir* groups to fight the guerrillas – both alongside the military and on their own, since they were often in a position to engage their opponents before troops could arrive. He justified arming these groups with long-range weapons after noting that their revolvers and smaller weapons were insufficient to combat the guerrillas.

49.     On information and belief, the impetus to organize *convivir* groups in Urabá came from Raúl Hasbún, a banana plantation owner who served as an intermediary between the banana companies and the AUC, and who eventually became commander of the AUC's Banana Bloc. Hasbún approached Uribe in 1997 with the intention of creating a *convivir* in Urabá. The paramilitaries, the government, and the banana companies saw the *convivir* as an ideal means of legalizing the companies' payments to the paramilitaries. In just a few months, Urabá had twelve *convivir* units.

50.     The *convivir* units in Urabá facilitated communication and collaboration between the government and paramilitaries. The twelve units functioned as a network and sent intelligence both to the military and to paramilitary commanders such as Hasbún. The military and paramilitaries would both respond to information detailing the location of guerrillas, but often

12

the military would allow the paramilitaries to take on the majority of the fighting, since the paramilitaries had better resources and fewer limitations on their conduct.

51.     Chiquita and other banana companies often made payments to one unit, the *Convivir* Papagayo, which passed the money on to the AUC.  *See infra* ¶¶76–78 (details on payment arrangements).

52.     The banana companies recorded these as payments for "security services."  However, personnel of Chiquita and other banana companies both in the U.S. and Colombia knew that the *convivir* was directing these payments directly to the AUC.  *See infra* ¶¶76–79, 112 (meeting between Chiquita and paramilitaries; details on payment arrangements).

53.     In 1997, the Colombian Constitutional Court affirmed the legality of the *convivir* system but prohibited *convivir* members from carrying restricted arms or conducting intelligence work. Many *convivir* units were dismantled, as these limitations crippled their effectiveness.  The *Convivir* Papagayo was one of only two *convivir* units that remained, as it remained useful as a conduit for payments from Chiquita and other banana companies to the AUC.   Arnulfo Peñuela, the director of the *Convivir* Papagayo at the time, is being prosecuted in Colombia for his ties to the AUC.

### C.   The AUC Acted Under Color of Authority of the Colombian Government in Committing the Acts Alleged Herein.

i)   *The AUC and other paramilitary groups were founded with the cooperation of the Colombian Government, and were assigned by the Government to combat left-wing guerrillas using methods that included using criminal violence against civilians and unions.*

54.     As part of the Colombian government's strategy for defeating the left-wing insurgency, senior officials in the Colombian civilian government and the Colombian security forces collaborated with the AUC and assisted the paramilitaries in orchestrating attacks on civilian

13

populations, extra-judicial killings, murders, disappearances, forced displacements, threats and intimidation against persons including Plaintiffs.

55.    Paramilitarism was state policy in the Republic of Colombia.  Because the regular military was unable to effectively address the FARC insurgency, the Colombian government decided to facilitate the creation and funding of the AUC and other paramilitaries with the aim of using this unofficial force to defeat the insurgency.

56.    As outside organizations placed increased pressure and scrutiny upon the military to improve its human rights record, military leaders decided to leave much of their "dirty work" – brutal violence against civilians and suspected guerrillas in violation of Colombian and customary international law – to the paramilitaries.  Despite the fact that the AUC was a party to the armed conflict and thus was subject to the laws of war, one commander of the AUC asserted, "the Colombian military felt itself bound to the Geneva Conventions.  The AUC was not."

57.    As a result of this interdependence, longstanding and pervasive ties have existed between the paramilitaries and official Colombian security forces from the beginning.  In the 1980s, paramilitaries were partially organized and armed by the Colombian military and participated in the campaigns of the official armed forces against guerrilla insurgents. Paramilitary forces included active-duty and retired army and police personnel among their members. Despite the 1989 Decree establishing criminal penalties for providing assistance to paramilitaries, the continued existence of military/paramilitary ties has been documented by Colombian non-governmental organizations, international human rights groups, the U.S. State Department, the Office of the U.N. High Commissioner for Human Rights, and the Colombian Attorney General's office.  Cooperation with paramilitaries has been demonstrated in half of Colombia's eighteen brigade-level Army units, spread across all of the Army's regional divisions. Such cooperation is

14

so pervasive that the paramilitaries are referred to by many in Colombia as the "Sixth Division" – a reference to their close integration with the five official divisions of the Colombian Army.

58.     Since 2006, considerable information on paramilitarism and the atrocities of the Colombian civil war has emerged as part of Colombia's Reparation and Reconciliation process. Largely using information derived from this process, Colombian authorities have charged members of Colombia's Congress, former lawmakers, the former head of the secret police, mayors and former governors with illegally collaborating with paramilitaries. According to testimony from Salvatore Mancuso, who succeeded Castaño as national commander of the AUC, Vice President Francisco Santos and Defense Minister Juan Manuel Santos met and collaborated with paramilitaries like Mancuso in a plot to extend the paramilitary model to Bogotá.  Senior officers in the Colombian military, including but not limited to former Military Forces Commanders Major General Manuel Bonett,  General Harold Bedoya, Vice Admiral Rodrigo Quinones, Gen. Jaime Uscategui; Gen. Rito Alejo Del Rio, General Mario Montoya, Colonel Danilo Gonzalez, Major Walter Fratinni and Defense Minister Juan Manuel Santos, collaborated with, facilitated, and/or aided and abetted the AUC in the commission of various attacks on civilian populations, extrajudicial killings and other atrocities against civilians, and/or gave tacit support to and acquiescence in the AUC's activities.  General Montoya was linked to Diego Murillo, the former leader of an AUC-affiliated paramilitary group in Medellín. Many other high-ranking staff officers are known to have had close ties to the AUC and other paramilitaries, thereby creating a haven for the paramilitary activity in the very heart of the military establishment.

59.     Boundaries between the AUC and the military at times were amorphous, as some paramilitary members were former police or army members, while some active-duty military

members moonlighted as paramilitary members and became thoroughly integrated into these groups.  Paramilitary leaders noted that Colombian security forces in Urabá allowed members of the AUC to serve as proxies in their pursuit of guerrilla forces, largely due to the military's operative incapacity to defeat the guerrillas on its own.

60.     Colombian security forces in Urabá – with the knowledge and collaboration of high-level officials in the national government – have willfully failed to prevent or interrupt the crimes of the AUC, actively conspired with them, and coordinated activities with them. Documented examples in Urabá include:

- Allowing paramilitaries to establish permanent bases and checkpoints without interference, often within short distance of military bases for mutual support;

- Failing to carry out arrest warrants for paramilitary leaders, who move about the country freely;

- Withdrawing security forces from villages deemed sympathetic to guerrillas, leaving them vulnerable to attack by paramilitaries;

- Failing to intervene to stop ongoing attacks on civilian populations occurring over a period of days;

- Sharing intelligence, including the names of suspect guerrilla collaborators;

- Sharing vehicles, including army trucks used to transport paramilitary fighters;

- Supplying weapons and munitions;

- Providing special military training;

- Allowing passage through roadblocks;

- Providing support with helicopters and medical aid;

- Communicating via radio, cellular telephones, and beepers;

16

- Sharing members, including active-duty soldiers serving in paramilitary units and paramilitary commanders lodging on military bases; and

- Planning and carrying out joint operations.

61.     Accordingly, by late 1996, the AUC had become a major combatant in Colombia's civil conflict with the FARC. In most of the rural areas where the FARC had its strongholds, the Colombian military had ceded military operations to the AUC.  By 2001, the conflict between the AUC and the FARC had become a notorious exchange of atrocities.  The AUC became infamous for using tactics of terror on civilians living in and around areas that had been under FARC control, as a means of deterring support for the guerrillas and their ideologies.

   *ii) The AUC consistently operated in Urabá with the cooperation, coordination, and assistance of the Colombian Government when attacking civilians.*

62.     It was in Urabá that a model of collaboration between the paramilitaries, the business sector, and the government was developed and perfected.  An alliance was formed between politicians, active military units, multinational companies, businessmen, and paramilitaries in order to impose a regime of terror and consolidate the dominance of the AUC, which would wrest control of the countryside back from the leftist guerrillas.  The first paramilitary groups to operate in Urabá in a systematic and continuous manner received special training from the Colombian military.

63.     When the government or the military was not able to legally arrest or attack civilians, they would delegate the task to the AUC or to *convivir* associated with the paramilitaries to act on their behalf.  These targets included suspected guerrilla sympathizers, including teachers, community leaders, trade unionists, human rights defenders, religious workers, and leftist politicians, as well as people with no known or suspected ties to the guerrillas but who were

17

killed to terrify and dominate the civilian population.  According to both H.H. and Raúl Hasbún, the military gave the AUC lists of people to kill when they felt impotent to fight the guerrillas themselves legally and constitutionally, or when they could not arrest and try them for any crime.

64.      In addition to violently attacking civilians, the paramilitary performed other functions for the military in its war against the guerrillas.  For example, at times, the military and paramilitaries would cooperate to evict communities from their land.  In 2001, the paramilitaries carried out a food blockade in Urabá that severely affected the civilian population in an effort to "decrease the military capacity of the enemy."

65.      The AUC in Urabá consistently ran joint operations with the military.  The 17th Brigade of the Colombian Army, located in the Urabá region, and the 4th Brigade, sister unit to the 17th Brigade in the Medellín region, were especially active in their support of and involvement in paramilitary activities, up to and including engaging in joint operations.  For example, the Elmer Cárdenas Bloc of the AUC regularly received logistical support and transportation from the 17th Brigade and other units of the Colombian army and conducted joint operations with the 17th Brigade.

66.      General Rito Alejo del Río Rojas, the commander of the 17th Brigade from 1995 to 1997 who was responsible for military operations in Urabá, was notorious for his collaboration and collusion with paramilitaries in the region.  H.H. has described General del Río as one of the most important factors in allowing the expansion of paramilitarism in Urabá, because of the cooperation and support he gave the AUC in the regions where the 17th Brigade operated and elsewhere.  General del Río was known as the "father of the paramilitaries" because he gave them uniforms and military training.

18

67.     General del Río was finally arrested in 2008 and is currently in custody on a military base in Bogotá and is on trial for his collaboration with the AUC.  He is accused of conspiracy to murders committed by paramilitaries in Urabá during his time as 17th Brigade Commander.  H.H. has testified that he twice witnessed del Río meeting with the founder and national commander of the AUC, Carlos Castaño.  Salvatore Mancuso testified that del Río met with him and other commanders to coordinate the paramilitaries' expansion throughout northern Colombia.

68.     AUC paramilitaries could enter and leave the 17th Brigade's headquarters at will, with the knowledge and permission of General del Río.  In one instance, H.H. discovered that a criminal whom the AUC sought was being held at the Brigade headquarters; he and others from the AUC went to the 17th Brigade, picked up the prisoner, transported him to the port at Turbo using a military van, and murdered him.  Salvatore Mancuso reported a similar story.  Furthermore, on his visits to the 17th Brigade – during which he often planned joint operations with General del Río and then-Captain Bayron Carvajal – H.H. was consistently allowed to recruit soldiers for the AUC.

69.     General del Río's role in promoting and supporting paramilitarism was not merely the work of a single rogue military officer; rather it was part of the Colombian government's strategy to fight the guerrillas.  On information and belief, many other army brigades had similar relationships with paramilitaries, including the 4th and 11th Brigades.

70.     Gloria Cuartas, then the mayor of Apartadó, and others complained repeatedly and provided evidence to the General's superiors about his collusion with paramilitaries, but their complaints were ignored.  Colonel Carlos Alfonso Velasquez Romero, a 17th Brigade officer, was investigated and discharged in January 1997 on the order of Army Commander Harold Bedoya when he tried to report on the General and the 17th Brigade's close association with the AUC.

19

71.     On information and belief, Colonel Anatolio Correa Figueroa and Colonel Santiago Parra Rubiano of the Urabá Police colluded with the AUC to block complaints against the AUC or their military collaborators from developing into investigations or prosecution.

72.     In October 1997, members of the Army's 4th Brigade established a perimeter around the village of El Aro, in Antioquia.  While the Army prevented entry and escape, members of the AUC entered the village and over a period of five days executed at least eleven people, burned most of the houses, looted stores, and destroyed pipes that fed the homes potable water.  Upon leaving the village, the paramilitaries forcibly disappeared over thirty more people and compelled most of the residents to flee.

73.     On February 19, 2000, the AUC selectively assassinated five banana workers in the "peace community" of San Jose de Apartadó, in Urabá; reports indicated that members of the 17th Brigade were direct participants in the attack.

74.     When asked to rank their collaboration between the AUC and the Colombian military on a scale of one to 10, with 10 being maximum collaboration, H.H. rated it as a 10, specifically citing the helpfulness of General del Río and Colonel Carvajal.

75.     This model of collaboration between the paramilitaries, the companies, and the government was so successful in Urabá that Raúl Hasbún explained it to Jorge 40, commander of the AUC in the Magdalena region, so he could implement it there.  Thereafter, the model spread to many other regions of Colombia.

*iii)The AUC took on numerous State functions in Urabá, including the maintenance of security and order, the disposition of personal and commercial disputes, the provision and regulation of social services, and the imposition of social rules.*

76.     Throughout Urabá, Santa Marta and other regions of Colombia, the AUC took on a wide variety of roles that are generally thought of as state functions.  In many urban areas, the AUC

coexisted with civilian authorities and took on police and military functions, among others.  In some rural areas – and particularly on banana plantations – the paramilitaries were virtually the only public authority.

77.  The paramilitaries took on so many governmental functions in Urabá that it became a common saying in the area that "Here, paramilitaries and the State are the same thing."  It was the paramilitaries who would receive complaints from locals regarding criminal activity or conflicts with neighbors, and it was they who dispensed their brutal brand of justice in response.

78.  In addition to settling disputes between individuals, the AUC became involved in social issues.  The paramilitary organizations' involvement in residents' daily lives reached the extent of intervention in domestic issues, disputes between neighbors, collection of debts, and truancy from school.

79.  The AUC was even able to control the roads; on information and belief, they were able to shut down stretches of the Pan-American Highway on some occasions in order to use it as a runway for planes arriving with weapons and ammunition and exporting drugs.

### D. Chiquita Supported the AUC in Urabá.

80.  Chiquita, as the successor to the United Fruit Company and the United Brands Company, has been involved in the production and exportation of produce from Central and South American nations, including Colombia, for over a century. At all relevant times, Chiquita produced bananas in the Urabá and Santa Marta regions of Colombia.

81.  On information and belief, from no later than 1995 until at least 2004, Chiquita provided material support, including money and services, to the AUC and its predecessors.

82.  Chiquita's assistance helped the paramilitaries to consolidate as a decisive actor in the political, military, and social terrain of the banana region.  In exchange for its financial support

to the AUC, Chiquita was able to operate in an environment in which labor and community opposition to their operations and policies was suppressed.

   i)   *Chiquita regularly made payments to the AUC.*

83.   From 1995 until at least February 2004, Chiquita provided material support to the AUC in Urabá and Santa Marta.  By 1997, the AUC effectively controlled large swathes of territory – particularly in the towns and urban areas – as well as exerting influence in institutions such as labor organizations and local governments in these regions.

84.   In 1995 and 1996, Chiquita made payments to the ACCU's Banana Bloc.

85.   Chiquita paid the AUC nearly every month during the period 1997–2004, making over one hundred payments to the AUC totaling over $1.7 million. During those years, the AUC killed 3,778 people and displaced approximatedly 60,000 in its war on the guerrillas in Urabá.

86.    Chiquita's payments to the AUC were reviewed and approved by senior executives of the corporation, including the Decedent, Freidheim, Olson, Kistinger, Keiser and Tsacalis and high-ranking officers, director and employees. Chiquita's senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño.

87.   Some of Chiquita's payments were made directly to the AUC or to front organizations like the *Convivir* Papagayo.  The majority of direct payments were made in the form of checks written to the *convivir*, drawn on Banadex's Colombian bank account.  Chiquita concealed the nature of these payments by recording them in corporate books and records as "security payments" or payments for "security" or "security services."

88.   In September 2000, Olson was informed of the results of an investigation into Chiquita's payments to the AUC, which had been carried out by in-house Chiquita attorneys. Olson then

reported the results to the company's Audit Committee. Both Friedheim and the Decedent were present at this meeting. By March 2002, Tsacalis had designed new procedures to disguise payments to the AUC. Olson, Hills and other individuals who had been present at the presentation of the investigation reviewed and implemented these procedures.

89.     Under the new procedures, Banadex executives Moe 11 and Moe 12 received checks with the intent that they would be withdrawn as cash and handed directly to the AUC.  Moe 11 received a check made to him personally and drawn on the Colombian bank accounts of Chiquita's subsidiary. Moe 11 then endorsed the check and Moe 11 or Moe 12 cashed it. Moe 12 hand delivered the cash to AUC personnel in Santa Marta. Corresponding tax liability was withheld and Moes 11 and 12 reported and paid income tax as if the payments were actually being made to them instead of the AUC.  Chiquita made payments in this way in order to conceal the fact that they were actually paying the AUC; it recorded these payments simply as income contributions.

90.     Chiquita formed an agreement with the AUC, paying them in exchange for their services in pacifying the banana-growing region and suppressing union activity.  This agreement specified that Chiquita would pay the paramilitaries a fixed amount for each box of bananas exported.

91.     At all relevant times, Chiquita knew that the AUC was a violent, terrorist paramilitary organization, as its brutal aims and tactics were well-known in Colombia as a central feature of the Colombian civil war. On September 10, 2001, the United States government designated the AUC as a Foreign Terrorist Organization ("FTO").  That designation was well-publicized in the American public media, including in the *Cincinnati Post* on October 6, 2001, and in the *Cincinnati Enquirer* on October 17, 2001, as well as in the Colombian media. Following the

designation, from on or about September 10, 2001, through on or about February 4, 2004, Chiquita made 50 payments to the AUC totaling over $825,000.

92.     On or about September 12, 2001, Moe 12 paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $31,847.

93.     On or about November 14, 2001, Moe 11 and Moe 12 paid the AUC in Urabá and Santa Marta by check in the amount equivalent to $56,292.

94.     On or about December 12, 2001, Moe 11 and Moe 12 paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $26,644.

95.     On or about February 4, 2002, Moe 11 and Moe 12 paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $30,079.

96.     On or about March 7, 2002, Moe 11 and Moe 12 paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $25,977.

97.     On or about March 31, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in two equal payments in amounts equivalent to $3,689 each.

98.     On or about April 16, 2002, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $35,675.

99.     On or about May 15, 2002, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $10,888.

100.    On or about May 31, 2002, Moe 11 and Moe 12 paid the AUC Santa Marta in cash in two equal payments in amounts equivalent to $3,595 each.

101.    In or about June 2002, Moe 11 and Moe 12 began making direct cash payments to the AUC in the Santa Marta region of Colombia according to the procedures referenced in Paragraph 89.

24

102.    On or about June 11, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in three payments in amounts equivalent to $4,764, $6,670 and $6,269, respectively.

103.    On or about June 14, 2002, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $31,131.

104.    On or about July 2, 2002, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $11,585.

105.    On or about July 9, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $5,917.

106.    On or about August 6, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $4,654.

107.    On or about August 15, 202, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $27,841.

108.    On or about September 2, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $4,616.

109.    On or about October 7, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $8,026.

110.    On or about October 15, 2002, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $40,419.

111.    On or about November 8, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $6,164.

112.    On or about November 29, 2002, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $5,685.

113.    On or about December 9, 2002, Moe 11 and Moe 12 paid the AUC in Urabá by check in

an amount equivalent to $47,424.

114.    On or about January 21, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $7,954.

115.    On or about January 27, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $22,336.

116.    On or about February 11, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $7,291.

117.    In 2003, Chiquita consulted with attorneys from the District of Columbia office of a national law firm ("outside counsel") about Chiquita's ongoing payments to the AUC.  Outside counsel advised Chiquita that the payments were illegal under United States law and that Chiquita should immediately stop paying the AUC directly or indirectly.  Among other things, outside counsel advised Chiquita:

> "Must stop payments."
> (notes, dated February 21, 2003)
>
> "Bottom Line: CANNOT MAKE THE PAYMENT"
> "Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"
> "General Rule: Cannot do indirectly what you cannot do directly"
> "Concluded with: CANNOT MAKE THE PAYMENT"
> (memo, dated February 26, 2003)
>
> "You voluntarily put yourself in this position. Duress defense can wear out through repetition. Buz [business] decision to stay in harm's way. CHIQUITA should leave Colombia."
> (notes, dated March 10, 2003)
>
> "[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"
> (memo, dated March 11, 2003)
>
> [T]he company should not make the payment."
> (memo, dated March 27, 2003)

118.    Although CBI's Board of Directors agreed to disclose its payments to the AUC to the

U.S. Department of Justice on or about April 3, 2003, on or about April 4, 2003, according to

outside counsel's notes concerning a conversation about Chiquita's payments to the AUC, Olson

said, "His and Hills' opinion is just let them sue us, come after us. This is also Freidheim's

opinion." On April 8, 2003, the Decedent Hills and Kistinger met with two Chiquita employees

and Moes 11 and 12 and instructed them to continue making the payments to the AUC.  On April

24, 2003, the Decedent and Olson, along with outside counsel, met with Justice Department

officials, who told CBI the payments were illegal.  Nonetheless, Chiquita continued to make the

payments through Moes 11 and 12 until at least February 2004.

119.    On or about May 12, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in

an amount equivalent to $6,105.

120.    On or about May 21, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in an

amount equivalent to $47,235.

121.    On or about June 4, 2003, Moe 11 and Moe 12paid the AUC in Santa Marta in cash in an

amount equivalent to $7,623.

122.    On or about June 6, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in

two payments in amounts equivalent to $6,229 and $5,764, respectively.

123.    On or about July 14, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in

an amount equivalent to $7,139.

124.    On or about July 24, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in an

amount equivalent to $35,136.

125.    On or about August 8, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in

an amount equivalent to $5,822.

126.     On or about August 25, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $12,850.

127.     On or about September 1, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $6,963.

128.     On or about October 6, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $18,249.

129.     On or about October 6, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent $9,439.

130.     On or about October 24, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $30,511.

131.     On or about November 5, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $6,937.

132.     On or about December 1, 2003, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $6,337.

133.     On or about December 2, 2003, Moe 11 and Moe 12 paid the AUC in Urabá by check in the amount equivalent to $30,193.

134.     On or about January 9, 2004, Moe 11 and Moe 12 paid the AUC in Santa Marta in cash in an amount equivalent to $10,630.

135.     On or about January 13, 2004, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $27,958.

136.     On or about February 4, 2004, Moe 11 and Moe 12 paid the AUC in Urabá by check in an amount equivalent to $4,795.

137.   On March 19, 2007, Chiquita pled guilty in U.S. District Court for the District of
Colombia to one count of engaging in transactions with a specially designated global terrorist.
The company's sentence included a $25 million criminal fine, the requirement to implement and
maintain an effective compliance and ethics program, and five years' probation.

   ii)   *Chiquita facilitated the AUC's arms shipments.*

138.   In 2001, Chiquita facilitated the clandestine and illegal transfer of arms and ammunition
from Nicaragua to the AUC.

139.   The Nicaraguan National Police and Army were involved in a deal that provided 3,000
AK-47 assault rifles and 5 million rounds of ammunition to a private Guatemalan arms
dealership, Grupo de Representaciones Internationales S.A. ("GIR S.A."), in exchange for
weapons more suited to police work.  GIR S.A., in turn, arranged to sell the AK-47s and
ammunition for $575,000 to Shimon Yelinek, an arms merchant based in Panama.  In November
2001, Yelinek loaded the arms onto the *Otterloo*, a Panamanian-registered ship, with Panama as
its declared destination.

140.   Instead of docking in Panama, the *Otterloo* instead went to Turbo, Colombia, where
Chiquita, through Banadex, operated its own private port facility for the transport of bananas and
other cargo.

141.   After the *Otterloo* docked at Chiquita's port in Turbo, Banadex employees unloaded the
crates containing the rifles and ammunition. On information and belief, the AUC, which had free
access to the port, then loaded these rifles onto AUC vehicles and took possession of them.

142.   Chiquita was aware of the use of its facilities for the illegal transshipment of arms to the
AUC, and intended to provide such support and assistance to the AUC.  The documents
accompanying the shipment declared that the crates that in fact contained arms were filled with

plastic and/or rubber balls. However, in unloading the crates, the Banadex employees used heavy lifting machinery that would not have been necessary to move the crates' declared cargo. After being off-loaded, the crates remained at Chiquita's facilities for at least two additional days before fourteen AUC vehicles arrived to take possession of the arms. At least some of the arms were received by Freddy Rendón Herrera, the commander of the Elmer Cárdenas Block of the AUC in Urabá.

143. Giovanny Hurtado Torres, a highly-placed Chiquita employee from the port at Turbo, and several Colombian customs officials have been prosecuted for their purposeful involvement in the *Otterloo* transaction.

144. On information and belief, Chiquita facilitated at least four other arms shipments to the AUC; one of these shipments of arms through Chiquita's port involved the entry of 4,200 assault rifles.

145. On at least one occasion, José Leonardo Lopez Valencia, an electrical mechanic at Turbo, witnessed uniformed AUC members offloading crates directly from a Chiquita ship. On information and belief, those crates contained smuggled firearms.

146. In an interview with the Colombian newspaper *El Tiempo*, AUC leader Carlos Castaño subsequently boasted, "This is the greatest achievement by the AUC so far. Through Central America, five shipments, 13 thousand rifles."

147. The arms that Chiquita knowingly and intentionally aided the AUC to procure have been of substantial assistance to the AUC in its commission of untold crimes, including the killings and other conduct alleged herein. Many of these guns have not been turned in to the government and are still in use by the paramilitaries. In 2008, some were seized in Urabá from the Daniel Rendón Herrera's 'Heroes de Castaño' Front – another AUC subunit. The raid, executed by

Colombian authorities, netted hand grenades, mortar rounds, Claymore mines, electrical detonators, and 47 AK-47 assault rifles; the assault rifles were traced to the 2001 *Otterloo* shipment.

### iii)   *Chiquita facilitated the AUC's drug shipments.*

148.   Chiquita also assisted the AUC by allowing the use of its private port facilities for the illegal exportation of large amounts of illegal drugs, especially cocaine. The drug trade was a major source of income for the AUC, and Chiquita allowed the AUC access to its port facilities and ships for the purpose of smuggling drugs.

149.   Colombian prosecutors have charged that the AUC shipped drugs on Chiquita's boats carrying bananas to Europe.  According to H.H., the AUC would tie drugs to the hulls of banana ships at high sea to evade the control points of the security agencies.

150.   Cocaine hidden in Chiquita's banana shipments has been seized by the Colombian government on seven separate occasions.  More than one and one-half tons of cocaine have been found hidden in Chiquita's produce, valued at over 33 million dollars.  Two of the ships on which drugs were found were named the *Chiquita Bremen* and the *Chiquita Belgie*.

151.   On information and belief, drug shipments could not have been attached to Chiquita's banana boats without the active collusion or willful ignorance of Chiquita employees.  Chiquita could have prevented this drug trade and assistance to the AUC, but knowingly and purposely allowed use of its port and banana transportation boats for this purpose.

### E.  Chiquita's Conduct Aided and Abetted the AUC's Conduct Alleged Herein.

152.   Chiquita's conduct aided and abetted the killings and other conduct alleged herein, which constitute war crimes; crimes against humanity; torture; cruel, inhuman and degrading treatment; violations of the rights to life, liberty and security of person and peaceful assembly and

association; and terrorism, among other violations of Colombian, New Jersey, United States, and customary international law. Chiquita 1) substantially assisted the AUC paramilitaries who personally undertook the wrongful acts alleged herein, and 2) knew that its actions would assist in the wrongful acts at the time it provided the assistance.

   i) *Chiquita substantially assisted the persons who personally committed the acts comprising Plaintiffs' claims.*

153.   Chiquita's payments and facilitation of drug shipments contributed significantly to the perpetration of the crimes committed by the AUC by improving the AUC's financial situation and enabling it to purchase weapons and other war materiel. *See supra* ¶¶74–98 (Chiquita's support to the AUC).

154.   In addition to Chiquita's payments and facilitation of drug shipments, its assistance to the AUC in smuggling arms substantially and directly increased the paramilitaries' capacity to carry out its violent campaign against Urabá's civilian population. *See supra* ¶93 (smuggling of arms was major AUC achievement)

155.   Most of the firearms that were transferred to the AUC from the *Otterloo* shipment have never been recovered. On information and belief they and other similarly obtained firearms have been used in the commission of war crimes, crimes against humanity, and other violations, including those alleged in this complaint. *See supra* ¶94 (*Otterloo* shipment).

   ii) *Chiquita knew and intended that its actions would assist in the illegal or wrongful activity at the time it provided the assistance.*

156.   Chiquita knew that its actions would assist the AUC to continue killing, torturing, and committing other acts of illegal violence against civilians in Urabá. The AUC's use of violent tactics, including extrajudicial killings, to terrorize innocent civilians living in areas under FARC

control was well known in Colombia and was widely reported in the press in Colombia and the

United States.  In 1997, for example, the State Department noted:

> "[t]he many paramilitary groups took the offensive against the guerrillas, often perpetrating **targeted killings, massacres, and forced displacements of the guerrillas' perceived or alleged civilian support base** . . . **An active policy of depopulation, pursued by some paramilitary groups against communities suspected of guerrilla support**, was the primary cause of the growing internal displacement problem."

United States Department of State, *1997 Human Rights Report: Colombia*, at 2 (emphasis added).

157.    In 1999, the State Department noted:

> Paramilitary groups and guerrillas were responsible for the vast majority of political and extrajudicial killings during the year. Throughout the country, paramilitary groups **killed, tortured and threatened civilians suspected of sympathizing with guerrillas in an orchestrated campaign to terrorize them into fleeing their homes, thereby depriving guerrillas of civilian support**. The AUC paramilitary umbrella organization . . . exercised increasing influence during the year, extending its presence through violence and intimidation into areas previously under guerrilla control.

United States Department of State, *1999 Human Rights Report: Colombia*, at 2 (emphasis added).

158.    The United States government designated the AUC as a Foreign Terrorist Organization on

September 10, 2001, and that designation was well-publicized in the American public media. *See*

*supra* ¶81 (US media coverage). The AUC's designation was even more widely reported in the

public media in Colombia, where Chiquita had its substantial banana-producing operations.

159.    Chiquita had information about the AUC's designation as a Foreign Terrorist

Organization specifically and global security threats generally through an Internet-based,

password-protected subscription service that Chiquita paid money to receive. On or about

September 30, 2002, an employee of Chiquita, from a computer within defendant Chiquita's

Cincinnati headquarters, accessed this service's "Colombia – Update page," which contained the

following reporting on the AUC:

> US terrorist designation. International condemnation of the AUC human rights abuses culminated in 2001 with the US State Department's decision to include the paramilitaries

in its annual list of foreign terrorist organizations. This designation permits the US authorities to implement a range of measures against the AUC, including denying AUC members US entry visas; freezing AUC bank accounts in the US; and barring US companies from contact with the personnel accused of AUC connections.

160.     From on or about September 10, 2001, through on or about February 4, 2004, Chiquita made 50 payments to the AUC totaling over $825,000.  Chiquita never applied for nor obtained any license from the Department of the Treasury's Office of Foreign Assets Control with respect to any of its payments to the AUC.

161.     On or about February 20, 2003, Olson and an in-house attorney had a conversation about the AUC's designation by the United States government as a Foreign Terrorist Organization. Shortly thereafter, Olson and the Chiquita lawyer spoke with outside counsel about Chiquita's ongoing payments to the AUC.   Outside counsel advised Chiquita, through Olson and the in-house lawyer, that the payments were illegal under United States law and that Chiquita should immediately stop paying the AUC directly or indirectly. *See supra* ¶82 (advice of counsel about payments to the AUC).

162.     Despite the February 26, 2003 communication from counsel advising Chiquita's executives against making payments to the AUC, on or about February 27, 2003, two Chiquita employees in Colombia paid the AUC in Urabá by check in an amount equivalent to $17,434.

163.     Despite the March 27, 2003 communication from counsel advising Chiquita executives against making payments to the AUC, on or about March 27, 2003, the same two employees paid the AUC in Urabá by check in an amount equivalent to $19,437.

164.     Chiquita's acts of assistance to the AUC were made with the intent that the AUC continue carrying out acts of killing, torture, and other illegal violence against the civilian population of Urabá in accordance with the AUC's strategy for suppressing the FARC and deterring its sympathizers.  In exchange for its financial support to the AUC, Chiquita was able

to operate in an environment in which labor and community opposition was suppressed. Chiquita's assistance was not given out of duress; rather it was part and parcel of the company's proactive strategy to increase profitability and suppress labor unrest by exterminating the FARC in the Urabá region.

165.    Chiquita, along with other banana companies in Colombia, sought a meeting with the paramilitaries in late 1996 or early 1997. The meeting took place in Medellín, and a high-level U.S. Chiquita employee, most likely Charles Keiser, was present.  It was decided at this meeting that the banana companies would pay the paramilitaries. Carlos and Vicente Castaño led the negotiations with the companies; as a result of the negotiations, H.H. was ordered to patrol large swathes of the banana-growing region.

166.    Keiser personally met with leaders of the AUC and planned a system of payment. On information and belief, in order to operate its banana production in an environment free of labor opposition and social disturbances, Chiquita agreed to a whereby the company would pay the AUC a certain amount per box of banana exported, and would help to arm and otherwise support the AUC and other terrorist groups during the period of the killings and other conduct alleged herein.

167.    The arrangement between Chiquita and the AUC was not one of duress; in fact, it was the banana companies that approached the AUC to initiate their relationship.  Mario Iguaran, the former Attorney-General of Colombia, has charged that there was a criminal relationship between Chiquita and the AUC in which Chiquita supplied money and arms to the AUC in return for the "bloody pacification of Urabá."

168.    As part of its deal with Chiquita, the AUC provided protection services to banana plantations, dealing out reprisals against real or suspected thieves, as well as against social

undesirables, suspected guerrilla sympathizers or supporters, and anyone who was suspected of opposing the AUC's activities or social program.

169.    By arming and financing the AUC, Chiquita intended to benefit from the AUC's systematic killings of civilians. After its agreement with Chiquita, the AUC understood that one goal of its campaign of terror was to prevent work stoppages in the banana plantations.  Anyone who disrupted the smooth operations of the plantations knew what the consequences could be. For example, one individual who worked in Chiquita's offices at a plantation in Urabá was present when paramilitaries arrived at the plantation and summarily executed a banana worker who had been seen as a troublemaker because his slow work held up the production line. Another individual saw paramilitaries arrive to threaten banana workers after a salary dispute.

170.    In concert with the army, which assisted banana growers by occupying banana plantations and arresting union leaders or forcing laborers to work during strikes, the AUC undertook an extensive campaign of murdering civilians in order to break the back of the unions. According to Gloria Cuartas, "They pulled out a map where they said which plantations allegedly had a FARC presence and started killing workers and union members, until the organizational structures of the union and the board of Sintrainagro [the local union of planattion workers] were left totally in the hands of the 'Esperanzados' [the ELN]." By that time, the ELN, which had previously been an anti-government guerrilla group, had been coopted by the paramilitaries

171.    Chiquita's assistance also helped the AUC to gain access to its perceived opponents who worked for the company.  José Gehiener Arias Ramirez, a Chiquita employee who was later killed by the AUC, repeatedly witnessed AUC members entering the Chiquita packing house to threaten workers from the Barrio Policarpa, whose residents were viewed as hostile to the AUC.

36

172.    The stability and social control provided by the AUC was to Chiquita's benefit, in that it minimized the expenses incurred and eliminated disruptions in the exportation of bananas.  As a result of the AUC's actions, Chiquita was able to dismantle social assistance programs to which the banana companies had agreed through negotiations with the unions in the 1980s, thereby lowering its production costs.  The influence of the AUC in the leadership of the banana workers' trade unions was also to Chiquita's benefit, as it reduced labor strife.

173.    As a result of the paramilitaries' intervention, Castaño was able to brag in 2001 that "**in the past three years there have been no strikes** in the banana-growing region, and the Sintrainagro unions work shoulder-to-shoulder with the employers to promote the [economy of the] zone." Carlos Castaño, *Mi Confesión* (emphasis added).

174.    In addition to directly suppressing labor activity, the paramilitaries regulated the banana-growing population and protected Chiquita's profitability by controlling the provision of medical services in the towns of Urabá.  Residents of Apartadó reported that they feared seeing doctors because they believed that medical personnel were under the control of the AUC.  On information and belief, this arrangement benefited Chiquita because it allowed the paramilitaries to inform the company of its employees' medical issues that could potentially affect labor productivity, including pregnancy.  It also allowed the paramilitaries to prevent doctors from certifying worksite injuries or providing medical excuses to workers, which would have raised costs for the company.

### F.  Chiquita Joined the AUC's Conspiracy to Commit the Acts Alleged Herein.

175.    By its conduct, Chiquita joined the AUC's conspiracy to eliminate the FARC through violent attacks on guerrillas and suspected guerrilla sympathizers and terrorization of the civilian population.  The killings alleged herein, which constitute war crimes; crimes against humanity;

torture; cruel, inhuman and degrading treatment; violations of the rights to life, liberty and security of person and peaceful assembly and association; and terrorism, among other violations of Colombian, New Jersey, United States, and customary international law, were committed by members of the AUC in furtherance of the conspiracy.  Chiquita's actions constituted conspiracy in that (1) two or more members of the AUC agreed to carry out their terrorist campaign against civilians, (2) Chiquita joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it, and (3) one or more of the violations alleged herein was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy.

> i)   *Members of the AUC agreed to fight the FARC by means of illegal violence against particular classes of civilians, thereby constituting a conspiracy of two or more persons who agreed to commit a wrongful act.*

176.   The AUC was formed based on agreement between its leaders, government backers, and private supporters, to eliminate the FARC through extermination of guerrillas and suspected guerrilla sympathizers and the systematic terrorization of the civilian population.  The AUC purposely targeted civilians, even those with no known ties to the guerrillas.  Thus the use of illegal, violent means, including war crimes and extrajudicial killings, was always central to the group's mission and strategies.

> ii)  *Chiquita joined the conspiracy knowing that the AUC intended to fight the FARC by means of illegal violence against particular classes of civilians, and intending to help accomplish that goal.*

177.   Chiquita began conspiring with the paramilitaries in 1995 or earlier; its first direct payments to the Banana Bloc of the ACCU were made no later than 1995.  Chiquita sought a meeting with the paramilitaries in late 1996 or early 1997 and concluded an agreement with the AUC whereby Chiquita paid the paramilitaries for their services supporting the banana

plantations.  These services consisted of threatening or killing civilians, including workers who attempted to strike, union leaders, alleged criminals, and small banana farmers who refused to sell or abandon their land. *See supra* ¶¶111–121.

178.    Chiquita knew of the AUC's goal of eliminating the FARC through the killing of suspected sympathizers and innocent civilians.  They also knew of their primary tactic of targeting civilians in order to intimidate this population from supporting the FARC.  *See supra* ¶¶103–104 (Chiquita's knowledge).  Chiquita joined the conspiracy intending to benefit from the AUC's strategy; the AUC's methods would reduce Chiquita's costs and risk exposure by suppressing labor unrest through the elimination of those who opposed the banana plantations or threatened their profitability.

179.    Chiquita, as a co-conspirator, arranged illegal money payments, smuggled drugs and arms, and facilitated and condoned murders in furtherance of the conspiracy.

 *iii)The AUC's conduct alleged herein was committed by members of the AUC in furtherance of the conspiracy's goal of fighting the FARC by means of illegal violence against particular classes of civilians.*

180.    All of Plaintiffs' decedents were killed by the AUC in furtherance of the conspiracy. Their status as social activists, unionists, alleged criminals, or victims of FARC extortion led to their inclusion in groups perceived by the AUC and the State as being sympathetic to the FARC and ultimately to their murders.  *See infra* ¶¶134–163 (Plaintiffs' Injuries).

 **G.  The AUC Acted as Chiquita's Agent in Committing the Acts Alleged Herein.**

181.    Chiquita formed an agreement with the AUC, paying them in exchange for their performance of inherently dangerous and tortious activities: the suppression of union activity and elimination of alleged FARC supporters and other undesirables.  This agreement specified,

among other things, that Chiquita would pay the paramilitaries a fixed dollar amount for each box of bananas exported. *See supra* ¶¶71–98, 111–115 (Chiquita's support to the AUC, Chiquita's agreement with the AUC).

182.    Chiquita's intended that the AUC continue carrying out acts of killing, torture, and other illegal violence against the civilian population of Urabá in accordance with the AUC's strategy for suppressing the FARC and deterring its sympathizers. In providing the AUC with money and assistance with their arms and drug trafficking, Chiquita, the Decedent, and Non-Party Executives intended that the AUC obtain arms and continue their practice of killing civilians, especially those civilians who were perceived as threats to the profitability of the banana industry. *See* ¶¶116–121 (intentional assistance and benefits to Chiquita).

183.    The leadership of the AUC did, in fact, carry out killings of union members, social organizers and other undesirable groups, as well as civilians with no known or suspected ties to the guerrillas, knowing that Chiquita expected and intended that they do so using the arms and money provided by Chiquita.

184.    The AUC solved Chiquita's labor problems and kept down operational costs by killing and/or intimidating any worker that attempted to strike. *See supra* ¶¶118–120 (suppression of labor was part of agreement). The paramilitaries also dealt out reprisals against real or suspected thieves and social undesirables, and targeted suspected guerrilla sympathizers or supporters who could have threatened Chiquita's operations, including independent business cooperative owners and anyone espousing views that could be characterized as leftist, such as opposition politicians, vocal trade unionists, community leaders, and social activists. *See supra* ¶¶134–163 (Plaintiffs' Injuries).

185.    Chiquita authorized the AUC's strategy of killing, torture, and other illegal violence against civilians in Urabá.  The AUC's agreement with Chiquita involved forcing people to work using threats and illegal violence, as well as the quelling of labor and social unrest through the systematic terrorization of the population of Urabá.  *See supra* ¶¶111–121 (Chiquita's agreement with the AUC).

186.    Furthermore, Chiquita acquiesced in the AUC's conduct after the fact by continuing to pay them – and finding new ways to conceal the nature of those payments – despite full knowledge that their support was being used to carry out the crimes alleged herein.  *See supra* ¶¶103–110 (knowledge of AUC as terrorist group, illegality of payments).

## VI.    PLAINTIFFS' INJURIES

*John Doe 1/John Doe 2*

187.    John Doe 1's father, John Doe 2, was a banana worker in Urabá and active in labor organizing. In 2001, the area in which he lived was effectively controlled by the AUC.

188.    In 2001, John Doe 2 was traveling by bus from his home to the banana farm. The bus was stopped by AUC paramilitaries. The paramilitaries removed John Doe 2 from the bus and executed him.

189.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 2 through its support of the AUC in Urabá. On information and belief, Chiquita benefited from the death of John Doe 2 by removing a labor activist who threatened the stability of Chiquita's operations.

*Jane Doe 1/Jane Doe 2*

190.    Jane Doe 1's mother, Jane Doe 2, lived in a town in Urabá with her family. She was involved in civic, social and political activities, including advocating for marginalized groups. As a community activist, she was a member of one of the groups targeted by the AUC and the Colombian state in their war against the FARC and perceived FARC sympathizers.

191.    In 1998, Jane Doe 2 told Jane Doe 1 that she was afraid she would be killed for her activities. Approximately one week later, AUC paramilitaries arrived at Jane Doe 2's house. In the presence of her family, the paramilitaries removed Jane Doe 2 from her house and executed her. Subsequently, the family of Jane Doe 2, including Jane Doe 1, fled their community in fear.

192.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of Jane Doe 2 through its support of the AUC in Urabá.  On information and belief, Chiquita benefited from the death of Jane Doe 2 by removing a social activist who was seen as threatening the stability of Chiquita's operations and the generally established social order.

*John Doe 3/John Doe 4*

193.    John Doe 3's brother, John Doe 4, was a banana worker at a plantation in Urabá, and a leader of a labor union committee.

194.    In 1998, John Doe 4 was involved in a protest against low wages. John Doe 3 and John Doe 4 were eating lunch at their banana plantation when AUC paramilitaries approached John Doe 4, identified him by name, and executed him.

195.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 4 through its support of the AUC in Urabá.  On information and belief, Chiquita benefited from the death of John Doe 4 by removing a labor activist who threatened the stability of Chiquita's operations.

42

*Jane Doe 3/John Doe 5*

196.    Jane Doe 3's husband, John Doe 5, was a banana worker in Urabá.

197.    In 1997, John Doe 5 became a target of AUC paramilitaries because they accused him of paying ransom to the FARC for his kidnapped brother. The AUC took John Doe 5 from his banana farm and executed him.  AUC paramilitaries subsequently told John Doe 5's family that they had killed him.

198.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 5 through its support of the AUC in Urabá. On information and belief, Chiquita benefited from the death of John Doe 5 by strengthening the AUC itself, in sending a message that payment of revenue to AUC opponents such as the FARC would be dealt with harshly.

*Minor Does 1–4/John Doe 6/Jane Doe 4*

199.    The mother of Minor Does 1–4, Jane Doe 4, lived in a town in Urabá with her family. She was a civic and social activist.  As a community activist, she was a member of one of the groups targeted by the AUC and the Colombian state in their war against the FARC and perceived FARC sympathizers.

200.    In 2004, AUC paramilitaries came to Jane Doe 4's house and executed her in the presence of her family. Subsequently, the family of Jane Doe 4, including Minor Does 1–4, fled their community in fear.

201.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of Jane Doe 4 through its support of the AUC in Urabá. On information and belief, Chiquita benefited from the death of Jane Doe 4 by removing a social activist who was

ssen as threatening the stability of Chiquita's operations and the generally established social order.

### John Doe 7/John Doe 8

202.    John Doe 7's son, John Doe 8, was a banana worker at a plantation in Urabá.

203.    In 2000, John Doe 8 was accused by AUC paramilitaries of stealing from a banana farm. John Doe 8 was taken by an AUC paramilitary commander and executed.

204.    When John Doe 7 approached the AUC about the killing, the commander said that they had killed John Doe 8 because the AUC were guarding the farm and were responsible for preventing thefts, and suggested that they had eliminated a social undesirable. The commander also threatened John Doe 7 about pursuing an investigation.

205.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 8 through its support of the AUC in Urabá. On information and belief, Chiquita benefited from the death of John Doe 8 by sending a message that stealing from banana farms would result in being put to death without benefit of any judicial process.

### Jane Doe 5/John Doe 9

206.    Jane Doe 5's husband, John Doe 9, was a local union leader, a member of the national union organization, and a member of a political party that opposed the AUC.

207.    In July 1997, AUC paramilitaries stopped him while he rode his motorbike. After speaking with him, they tortured, decapitated, and dismembered him.

208.    A demobilized member of the AUC has confessed to the murder of John Doe 9.

209.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 9 through its support of the AUC in Urabá. On information and

belief, Chiquita benefited from the death of John Doe 9 by removing a labor activist who threatened the stability and profitability of Chiquita's operations.


*Jane Doe 6/John Doe 10*

210.    Jane Doe 6's husband, John Doe 10, was part of the leadership of an independent banana cooperative.

211.    One day in May 1999, John Doe 10 was participating in a soccer game.  After the game finished, two AUC paramilitaries sought him out and kidnapped him.  He was found the next day, dead, with six bullet wounds.

212.    In 1999 alone, four other members of the same banana cooperative were assassinated.

213.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 10 through its support of the AUC in Urabá.  On information and belief, Chiquita benefited from the death of John Doe 10 by sending a message that independent banana farms that threatened Chiquita's profitability would not be tolerated.


*Jane Doe 7/John Doe 11*

214.    Jane Doe 7's husband, John Doe 11, was a union leader and a banana worker.  He was a member of the joint committee of workers and management that negotiated salaries and working conditions on a banana farm.

215.    In June 1999, men who identified themselves as AUC paramilitaries arrived at John Doe 11's home and killed him with a knife.

216.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 11 through its support of the AUC in Urabá.  On information and

belief, Chiquita benefited from the death of John Doe 11 by removing a labor activist whose actions threatened the stability and profitability of Chiquita's operations.

## VII.   GENERAL ALLEGATIONS

217.    At all times, Chiquita, the Decedent, and Non-Party Executives knew or should have known that the AUC was a violent paramilitary organization continually engaging in vicious crimes and human rights violations against civilians in Colombia, including extrajudicial killing, torture, and forced disappearances.  The acts described herein were inflicted under color of law and under color of official authority, and/or in conspiracy with, and/or in a joint criminal enterprise with, and/or in concert with, and/or on behalf of those acting under color of official authority. The AUC has carried out its activities with both the tacit approval and active cooperation of official government security forces, pursuant to the overall war strategy of the Colombian government.  Moreover, high-ranking officials from across the Colombian government have been implicated in paramilitary collaboration, including at least fourteen members of Congress, seven former lawmakers, the head of the secret police, mayors, and former governors. Furthermore, Chiquita's payments to the AUC were facilitated by *convivir*, which were licensed by and operated with the express authority of the government.

218.    The acts described herein were conducted in the course of an internal armed conflict as part of the Colombian government's war strategy.  The AUC and other paramilitaries were parties to this armed conflict that engaged in combat with guerrilla armies on behalf of the government; they committed the abuses against Plaintiffs as part of their prosecution of this conflict.  The AUC and other paramilitaries were engaged in this conflict in partnership with the Colombian military.  The acts described herein were part of a widespread and systematic attack by the paramilitaries against the civilian population of the banana-growing region, as well as

against several discrete sub-populations, including but not limited to leftist politicians, labor organizers, community activists, persons considered socially undesirable, and perceived guerrilla sympathizers. This attack spanned a large swath of land in Colombia, resulted in the deaths of thousands of individuals, and was directed by a centrally-commanded paramilitary organization. On information and belief, at all relevant times Chiquita had knowledge of this attack.

219.   The acts and injuries to Plaintiffs described herein were part of a pattern and practice of systematic human rights violations paid for, facilitated, condoned, confirmed, aided and abetted, and/or ratified by Chiquita and/or committed in conspiracy with the AUC.

220.   As a direct and proximate result of Chiquita's unlawful conduct, Plaintiffs have suffered and will continue to suffer harm including pain and suffering, personal injuries, property damage, harm to their livelihoods, and extreme and severe mental anguish and emotional distress. Plaintiffs are thereby entitled to general and compensatory damages in amounts to be proven at trial.

221.   Plaintiffs' causes of action arise under and constitute torts under the following laws:

   a)  Alien Tort Claims Act, 28 U.S.C. § 1350;

   b)  Torture Victim Protection Act, 28 U.S.C. § 1350, note;

   c)  Customary international law;

   d)  Common law of the United States of America;

   e)  Statutes and common law of the State of New Jersey and the District of Columbia, including but not limited to wrongful death, assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, negligent hiring, and loss of consortium; and the

   f)  Laws of Colombia.

222.    Legal action by Plaintiffs in Colombia would be futile. In June 2004, Chiquita sold its Colombian subsidiary, Banadex.  On information and belief, Chiquita no longer owns any production operations in Colombia and is not subject to service there.  Furthermore, the political and legal system in Colombia is characterized by virtual impunity for the crimes of paramilitaries and those who assist them.  The vast majority of arrest warrants for paramilitary leaders are never carried out, and when such figures are arrested they are frequently released or allowed to escape from security facilities.  Military officers accused of collaboration with paramilitaries are routinely exonerated or given token sentences by military courts.  Prosecutors, investigators, and judicial officials who pursue cases of human rights abuses implicating paramilitaries are subject to death threats and assassinations, and many have had to resign or flee the country as a result.

223.    Legal action by Plaintiffs in Colombia would also result in serious reprisals.  Individuals who seek redress for paramilitary crimes committed against them or their family members are regularly targeted for further retributive violence.

224.    Chiquita, the Decedent, and Non-Party Executives took active steps to conceal its payments and other forms of support to the AUC.  *See supra* ¶¶74–84 (Decisions to conceal payments made at high levels within Chiquita).

225.    This concealment had the effect of preventing Plaintiffs from learning that Chiquita was responsible for their injuries.  Plaintiffs were unaware of Chiquita's support of the AUC until shortly after Chiquita's guilty plea in March of 2007.

226.    Chiquita's concealment of its role in plaintiffs' injuries prevented Plaintiffs from filing their claims at an earlier date.

48

227.    Plaintiffs were additionally unable to bring suit in Colombia or the United States until 2007 due to the poor security situation and the danger of reprisals, to which Chiquita's support of the AUC contributed.

228.    Several of the AUC paramilitary units active in the banana-growing region, including Bloque Norte and the Bloque Elmer Cárdenas, did not demobilize until 2006.

229.    Throughout this period, paramilitaries continued to kill and make threats against civilians in the banana-growing region.  In 2006, several human rights workers received death threats, including lawyers challenging paramilitary violence.

## VIII. CLASS ACTION ALLEGATIONS

230.    Plaintiffs seek certification of this action as a class action pursuant to Rules 23(b)(1)(B), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.  Plaintiffs allege that Chiquita intentionally supported a campaign of military and social control by the AUC from at least 1995 through 2004.  Plaintiffs seek to represent a class consisting of all persons who were the victims (or who are the relatives and/or legal representatives of decedent victims) of extrajudicial killing; forced disappearance; torture; cruel, inhuman, or degrading treatment; kidnapping; rape; forced displacement; crimes against humanity; or crimes against civilians constituting war crimes committed by the AUC in the banana-growing region of Urabá from 1995 through 2004.

231.    The members of the Class are so numerous that joinder of all members is impractical. The exact number and identities of all Class members is not currently known. According to reliable statistics, however, the AUC was responsible for many thousands of killings and many hundreds of massacres in Colombia between 1995 and 2004.  In the banana-growing region of Urabá alone, human rights organizations have documented over 3,700 murders by the AUC

between 1997 and 2004 and 60,000 forced displacements during the same period. These figures suggest that the Class at minimum numbers in the thousands and may exceed ten thousand.

232. Plaintiffs' claims are typical of those of the Class. Plaintiffs, like all members of the Class, were civilians inhabiting Colombia during the time period in which the AUC received substantial financial and other assistance from Chiquita, the Decedent, and Non-Party Executives, and who were injured by the AUC. The abuses committed by the AUC were committed as part of the AUC's campaign, supported by Chiquita, the Decedent, and Non-Party Executives, to exert control over the banana-growing region and eliminate the FARC by terrorizing civilians and perceived opponents.

233. Plaintiffs will fairly represent the interests of the Class because their interest in the case is identical to that of the Class as a whole: to prosecute the claims alleged herein to obtain full compensation due to them for the conduct of which they complain. Plaintiffs' claims implicate the common questions of law and fact listed *infra* ¶¶182(a)–(q), as do the claims of all or virtually all members of the Class. Plaintiffs have no interests that conflict with or are contrary to the interests of other Class members.

234. Plaintiffs will adequately represent the class in that their personal interest in the outcome of the case ensures that they will maintain an active awareness and involvement in the litigation so as to protect their own interests and those of the Class. Furthermore, they are represented by counsel with extensive experience in international human rights and class action litigation.

235. There are questions of law and fact that are common to the Class, including but not limited to:

   a) whether Chiquita, the Decedent, and the Non-Party Executives knew, should have known, or recklessly ignored, that the AUC was responsible for the extrajudicial killing,

50

forced disappearance, kidnapping, rape, forced displacement, property destruction, torture, or cruel, inhuman, or degrading treatment of civilians who lived in Colombia;

b) whether the assistance provided to the AUC by Chiquita, the Decedent, and the Non-Party Executives was substantial;

c) whether Chiquita, the Decedent, and the Non-Party Executives knew, should have known, recklessly ignored, or intended that the payments they made to the AUC were used to finance a campaign of terror directed at the civilian population in Colombia's banana growing region;

d) whether the AUC acted as an agent of Chiquita, the Decedent, and the Non-Party Executives in carrying out its campaign of murder and intimidation including whether they ratified such acts;

e) whether Chiquita, the Decedent, and the Non-Party Executives conspired with, entered into a joint criminal enterprise with, or aided and abetted the AUC;

f) whether Chiquita, the Decedent, and the Non-Party Executives facilitated the clandestine and illegal transfer of arms and ammunition to the AUC;

g) whether Chiquita, the Decedent, and the Non-Party Executives facilitated the AUC's drug shipments;

h) whether the AUC in committing the acts alleged herein acted under the color of state law and/or in a joint venture with official Colombian security forces;

i) whether the actions of the AUC constitute war crimes;

j) whether the actions of the AUC constitute crimes against humanity;

k) whether Chiquita, the Decedent, and the Non-Party Executives' actions constitute torts under the Alien Tort Statute, the Torture Victim Protection Act, or New Jersey, D.C., or Colombia law;

l) whether Chiquita, the Decedent, and the Non-Party Executives have been unjustly enriched by the violations set forth herein;

m) Chiquita, the Decedent, and the Non-Party Executives' behavior was negligent, including whether any of them engaged the AUC as an independent contractor and the AUC was incompetent and/or hired to do work that posed a risk of physical harm, whether there was a foreseeable risk of harm, and whether imposing a duty is fair;

n) the statutes of limitations are equitably tolled due to the conflict in Colombia or Chiquita's concealment of its actions;

o) whether Colombian statutes of limitations apply to the non-ATS claims;

p) whether this Court should order restitution or disgorgement of revenues and profits relating to the violations described herein; and

q) whether Chiquita, the Decedent, and Non-Party Executives should be subject to awards of compensatory and/or punitive damages and the proper measure thereof.

236.   Pursuant to Fed. R. Civ. P. 23(b)(1)(B), adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications and/or would substantially impair or impede their ability to protect their interests.

237.   Statistics gathered on human rights abuses committed by the AUC during the years 1997 to 2004 indicate that the Class at minimum numbers in the thousands and may exceed ten thousand.  *See supra* ¶178.  In other cases involving claims for human rights abuses under the

Alien Tort Statute and the Torture Victims Protection Act, individual plaintiff cases have received multi-million-dollar recoveries.

238.    Successful actions against the Decedent pursued independently by individual Class members could thus result in combined damages that exceed the damages that could be paid from the assets of the Decedent's Estate.

239.    According to the Probate Division of the District of Columbia Superior Court, the value of the personal property in the Decedent's Estate was reported at $4,200,000.

240.    Upon information and belief, the amount of damages which the Defendant can currently afford to pay from the assets of the Decedent's estate is exceeded by the claims of the Class members.

241.    Pursuant to Fed. R. Civ. P. 23(c)(4), class certification is appropriate as to the issues common to the Class members' claims, identified above, as resolution of these issues would materially advance the litigation and class resolution of these issues is superior to repeated litigation of these issues in separate trials.

242.    In the alternative, certification pursuant to Fed. R. Civ. P. 23(b)(3), is appropriate as questions of law and fact common to the members of the class predominate over any questions affecting only individual members.  The vast majority of Plaintiffs' allegations implicate questions of liability relevant to the entire Class, some of which are identified above; their resolution would therefore address most of the issues required to establish or disprove the Defendant's liability for the injuries of all Class members.

243.    Also pursuant to Fed. R. Civ. P. 23(b)(3) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## IX. CLAIMS FOR RELIEF

### A.  First Claim for Relief – War Crimes

244.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

245.    The AUC's conduct alleged in this complaint constitutes violence to life and person, including extrajudicial killing, torture, mutilation, the taking of hostages, the carrying out of executions without previous judgment pronounced by a regularly constituted court, incidents of outrages upon human dignity, forced movement, pillage, and denial of medical treatment.

246.    The AUC's acts violate the law of nations in that they were committed in the course of war crimes, because 1) an armed conflict was ongoing; 2) the AUC was a party to the conflict; 3) Plaintiffs and countless other victims of the AUC's acts did not take active part in the hostilities; and 4) the acts were committed in the course of armed conflict.  These acts are thus war crimes regardless of whether the AUC acted under color of state authority.

247.    The war crimes described herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law and the common law of the United States, the statutes and common law of New Jersey and the District of Colombia, and the laws of Colombia. Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.

248.    The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the war crimes committed against Plaintiffs.

i)    *The civil war in Colombia is an armed conflict within the meaning of the laws of war.*

249.    The Colombian civil war is an "armed conflict not of an international character," as specified in Common Article 3 of the Geneva Conventions, which hold that in such cases, specific acts such as torture and "carrying out of executions without previous judgment pronounced by a regularly constituted court" constitute war crimes when committed against non-combatants.

250.    There is no dispute that at all relevant times, and up until the present, Colombia has been devastated by a long-standing civil conflict. This has been widely documented and, to Plaintiffs' knowledge, has never been disputed in this or any other case. For example, the State Department noted in 1997 that the Colombian government's control of national territory "has been increasingly challenged by longstanding and widespread internal armed conflict and rampant violence. . ." *1997 Human Rights Report: Colombia*, at 1.

251.    During all times relevant to this complaint, the civil war in Colombia pitted the Colombian government – along with its paramilitary allies, including the AUC – against the FARC and other left-wing guerrilla insurgents.  The Colombian civil war has continued uninterrupted since at least 1946, and has claimed the lives of over 300,000 people.  Both Venezuela and Ecuador´s presidents have referred to the FARC as a belligerent force.  The Colombian government has engaged in prisoner exchanges with the FARC in the past.  It held extensive negotiations with the FARC during the 1998–2002 time period, with involvement of the United Nations, and ceded a large portion of its territory to FARC control, referred to as the *zona de despeje*, or cleared zone.  During that time, the FARC assumed the powers of government in the area under its control, including judicial and police powers.

*ii)*    *The AUC was a party to the armed conflict in Colombia.*

252.   Once Colombia's various paramilitary groups consolidated in 1997 under the leadership of Carlos Castaño, the AUC became the most visible armed opposition to the FARC, which, by late 1996, had become Colombia's most prominent leftist rebel group. From that time until its demobilization, the AUC was a major combatant in Colombia's civil conflict with the FARC.  In most of the rural areas where the FARC had its strongholds, the Colombian military ceded military operations to the AUC.  By 2001, the conflict between the AUC and the FARC had become a notorious exchange of atrocities.  *See also supra* ¶¶27, 45–66 (the AUC role in the Colombian civil war as a tool of the Colombian government, and its campaign of violence against civilians).

*iii)*    *Plaintiffs did not take active part in the hostilities.*

253.   Civilians are entitled to the protections of Common Article 3 of the Geneva Conventions if they are "[p]ersons taking no active part in the hostilities."  Neither surviving Plaintiffs nor decedents were party to the armed conflict in Colombia, as they were not members of the FARC, the AUC, or, indeed, any armed group that participated in the conflict.  *See supra* ¶¶134–163 (describing Plaintiffs).

254.   Plaintiffs' decedents were not killed because they or anyone related to them had taken part in the hostilities in any way.  Rather, they were victims of the campaign conducted against civilians by the AUC in an effort to discourage support of the FARC.  The AUC systematically murdered thousands of civilians without regard to whether they were actual participants in the civil war, as a warning to any potential guerrilla supporters. The AUC became known for using chain saws and machetes to dismember its victims in order to ensure that witnesses to this violence would never harbor or assist FARC guerrillas in their villages.

56

*iv)    Plaintiffs were killed in the course of the armed conflict.*

255.    Decedents were not killed simply against the background of war; rather, the use of criminal violence and intimidation against civilians was part of the war strategy against the FARC agreed on by the AUC and the Colombian Government, in which Chiquita was intentionally complicit.

256.    The AUC used extremely violent means to take back areas held by the FARC and employed tactics of violence and terror to target civilians regardless of whether they were participants in the civil war, with the intention of discouraging civilians from supporting the leftist guerrillas. This military tactic is documented by the U.S. Department of State.  *See supra* ¶¶104–105 (State Department reports documenting human rights abuses, including forced displacement)

257.    While this strategy was developed in Urabá, the model of collaboration between government and paramilitary was so successful that it was exported to the rest of the country and became part of the national war strategy. *See supra* ¶66 (paramilitarism model spread to Magdalena and elsewhere).

258.    Decedents were all members of particular social groups that were particularly targeted by the AUC as part of its war strategy.  *See supra* ¶¶32, 134–163 (AUC targeted particular groups, Plaintiffs' Injuries).

259.    In fact, all decedents were executed by the AUC as it used tactics of terror and violence, particularly in the areas that the FARC had a stronghold.  They were not merely incidental victims during a time of war; rather, they were victims of the war strategies and goals agreed on by the AUC and the Colombian state.

### B.  Second Claim for Relief – Crimes Against Humanity

260.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

261.    The conduct alleged in this complaint includes willful killing, torture, and arbitrary arrest and detention constituting crimes against humanity, in that the AUC carried out these acts 1) as part of a widespread or systematic attack 2) against a civilian population.  Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.  The acts of the AUC constitute crimes against humanity regardless of whether the AUC acted under color of state authority.

262.    The crimes against humanity described herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute  and Torture Victims Protection Act (28 U.S.C. § 1350), as well as violations of customary international law and the common law of the United States, the statutes and common law of New Jersey and the District of Columbia, and the laws of Colombia.

263.    The Defendant is liable to Plaintiffs because Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the crimes against humanity committed against Plaintiffs.

   *i)    The killings alleged herein were part of a widespread and systematic attack.*

264.    From late 1996 on, the AUC became a major combatant in Colombia's civil conflict with the FARC. In most of the rural areas where the FARC had its strongholds, the Colombian military had ceded military operations to the AUC. By 2001, the conflict between the AUC and the FARC had become a notorious exchange of atrocities. The AUC became notorious for using

58

tactics of terror on civilians living in and around areas that had been under FARC control.  *See supra* ¶¶53–66 (AUC strategy of targeting civilians in Urabá).

265.    The AUC killed thousands of civilians in Urabá.  Their war strategy involved killing civilians in towns near guerrilla groups in order to intimidate the population from providing any support to the guerrillas. This included anyone supporting the guerrillas' ideology, such as teachers, community leaders, social activists, trade unionists, human rights defenders, religious workers, and leftist politicians.  Many others not belonging to these groups were killed as well, as part of the AUC's efforts to establish complete dominance and deter support for the guerrillas.

266.    Decedents were all killed as part of a systematic attack on particular societal groups.  *See supra* ¶¶134–163 (Plaintiffs' Injuries).  In fact, all of Plaintiffs' decedents were executed by the AUC as it used tactics of terror and violence, particularly in the areas that the FARC had a stronghold.  They were not merely incidental victims during a time of war; rather, they were victims of the war strategies and goals agreed on by the AUC and the Colombian state.

*ii)    The killings alleged herein were part of an attack that was directed against a civilian population.*

267.    Decedents were killed as part of the AUC's strategy of terrorizing the civilian population of Urabá to discourage people from supporting the guerrilla insurgency.  By design, this attack was carried out without regard to whether the victims were actual participants in the civil war.  In fact, AUC commanders explicitly intended to kill civilians, with the understanding that such practices would deprive the guerrillas of their support base.  *See supra* ¶¶30–33, 53–55, 63–64, 104–105 (State Department reports, AUC's war strategies).

### C. Third Claim for Relief – Terrorism

268.    The allegations set forth in the above paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

269.    The conduct alleged in this complaint constitutes violations of the customary international law prohibition on terrorism, in that the AUC 1) directed violence against a civilian population 2) in order to coerce or intimidate that population.  The acts of the AUC constitute terrorism regardless of whether the AUC acted under color of state authority.

270.    The acts of terrorism described herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law and the common law of the United States, the statutes and common law of New Jersey, and the laws of Colombia.

271.    The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the acts of terrorism committed against Plaintiffs.

   i)   *The killings alleged herein constitute violence directed against the civilian population of Urabá.*

272.    Plaintiffs, decedents, as well as the vast majority of AUC targets in Urabá, were civilians and non-participants in Colombia's civil war.

   ii)   *The killings alleged herein were committed in order to coerce or intimidate the civilian population of Urabá and Colombia at large from supporting the FARC.*

273.    The AUC targeted not only guerrilla sympathizers but anyone suspected of supporting their leftist ideology, such as teachers, community leaders, trade unionists, human rights

defenders, religious workers, and leftist politicians.  The AUC targeted civilians in towns and neighborhoods where guerrilla support was believed to be high because they claimed guerrilla groups could only operate in the region with the logistical support of local towns.  *See supra* ¶¶ 30–33, 53–55, 63–64 (AUC war strategy).

274.   Killing the decedents was part of the general strategy of the AUC.  Through these murders, the AUC intended to deter others from providing support or from expressing views that could be construed as supporting the FARC or their ideology. *See supra* ¶¶ 134–163 (Plaintiffs' Injuries).

### D. Fourth Claim for Relief – Material Support to Terrorist Organizations

275.   The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

276.   The conduct of Chiquita, the Decedent, and the Non-Party Executives alleged herein constitutes violations of the customary international law prohibition on the illegal provision of material support to terrorist organizations, in that they 1) provided assets 2) to a terrorist organization 3) with the knowledge or intent that they would be used to carry out attacks on civilians 4) for the purpose of intimidating or coercing a civilian population.  Chiquita, the Decedent, and Non-Party Executives' conduct constitutes material support to terrorist organizations, regardless of whether they acted under color of state authority.

277.   The acts of material support to the AUC, a terrorist organization, described herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law and the common law of the United States, the statutes and common law of New Jersey and the District of Columbia, and the laws of

Colombia. Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.

278.     The Defendant is liable to Plaintiffs because the Decedent directly participated in the provision of material support to the AUC, and/or they aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with others, including members of the AUC, to provide material support to the AUC, whose terrorist actions caused Plaintiffs' injuries.

   i)   *Chiquita, the Decedent, and Non-Party Executives provided assets to the AUC in the form of money, arms and logistical support.*

279.     Chiquita, the Decedent, and Non-Party Executives provided a variety of forms of material support to the AUC, including cash and assistance in trafficking weapons and drugs.  The support that Chiquita provided was crucial to the AUC's success against the FARC in the area and its ability to continue killing civilians.  Indeed, prominent AUC commanders considered the group's success in smuggling in massive quantities of arms – some of which were still being used by the paramilitaries to commit crimes as recently as 2008 – as one of the AUC's greatest achievements. This success was made possible partially by Chiquita's money and the use of Chiquita's port at Turbo.  *See supra* ¶¶74–98 (Chiquita's support to the AUC).

   ii)   *The AUC was at all relevant times a terrorist organization.*

280.     At all times relevant to this Complaint, the AUC was an organization engaged in acts of premeditated, politically-motivated violence against noncombatant targets. *See supra* ¶¶ 30–33, 53–55, 63–64 (AUC's strategy of terrorizing civilians).

281.    The AUC's terrorist activities have been well-known at all relevant times, and, on information and belief, Chiquita, the Decedent, and the Non-Party Executives were aware of such activities.  From September 10, 2001, until the present, the AUC has been designated by the United States government as a Foreign Terrorist Organization. *See supra* ¶¶103–111 (Chiquita's knowledge).

iii)    *Chiquita knew and intended that the support it provided to the AUC would be used to carry out attacks on the civilian population of Urabá for the purpose of intimidating that population.*

282.    Chiquita knew of and intentionally supported the AUC's strategy of targeting civilians in order to intimidate the population of Urabá from supporting the FARC.  Chiquita provided this support in exchange for security and stability on the banana plantations, which the AUC achieved through the murder or disappearance of civilians such as union leaders, community activists, and suspected criminals.  *See supra* ¶¶103–121 (knowing and intentional support).

**E.  Fifth Claim for Relief – Extrajudicial Killing**

283.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

284.    The extrajudicial killings alleged herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of the Torture Victim Protection Act (28 U.S.C. § 1350 note), customary international law, the common law of the United States, the statutes and common law of New Jersey and the District of Columbia, and the laws of Colombia.

285.    The AUC committed acts of extrajudicial killing in that they carried out 1) deliberate killing of decedents 2) not authorized by a previous judgment pronounced by a regularly

constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

286.    The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the extrajudicial killings committed against Plaintiffs.

   i)    *The AUC's killings were carried out deliberately as part of the role assigned to them by the Colombian State to repress support of the FARC, but unauthorized by a judgment pronounced by any court.*

287.    The AUC killed Plaintiffs' decedents as part of the Colombian state policy of intimidating civilians from supporting the FARC.  *See supra* ¶¶ 45–70 (state action). The AUC committed many of these murders in the presence of family members or other community members, or they subsequently reported to the family that they were responsible for the killings. They openly killed civilians and discussed such killings in public in order to intimidate and threaten others.

288.    While the state supported the AUC in these efforts, they did not authorize them to commit these killings through a court judgment.  In fact, AUC leaders have stated that the military would give them names of alleged guerrillas to kill when the state did not have enough evidence to prosecute the individuals through Colombian courts.

289.    None of the decedents was killed pursuant to *any* judicial process at all.

290.    Killing the decedents was part of the general strategy of the AUC and Chiquita.  Through these murders, the AUC and Chiquita intended to deter others from supporting the FARC or their ideology.  *See supra* ¶¶134–163 (Plaintiffs' Injuries).

**F.  Sixth Claim for Relief – Torture**

291.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

292.    The acts of torture alleged herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of the Torture Victim Protection Act (28 U.S.C. § 1350 note), customary international law, the common law of the United States, the statutes and common law of New Jersey and the District of Columbia, and the laws of Colombia.

293.    The AUC committed acts of torture in that they 1) intentionally 2) caused Plaintiffs and their decedents to suffer severe mental or physical pain or suffering 3) for the purpose of punishing, intimidating or coercing Plaintiffs and their decedents.

294.    The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the torture committed against Plaintiffs.

   *i)    The AUC caused Plaintiffs and their decedents to suffer severe mental and physical pain and suffering.*

295.    Plaintiffs' decedents were in the custody of the AUC when they were tortured and killed. The family members of Jane Doe 2, Jane Doe 4, and John Doe 4, witnessed AUC members seeking out their relatives and executing them.  AUC paramilitaries removed John Doe 2 from a bus in the presence of others and executed him.  John Does 5, 8, 9, 10, and 11 were kidnapped and executed by the AUC; their family members only found out about their deaths after an

anguishing period of uncertainty.  At the time that the AUC paramilitaries murdered decedents, the paramilitaries had effective control of decedents by virtue of their numbers and weapons.

296.    The AUC's torture and execution of the decedents caused them severe mental and physical pain.  *See supra* ¶¶134–163(Plaintiffs' Injuries).

297.    The surviving Plaintiffs suffered severe mental and physical pain upon witnessing or learning of the murder of their family members.  Individual Plaintiffs also experienced suffering when they were threatened against pursuing investigations of the deaths of their family members and were forced to flee the area.  Furthermore, they suffered severe mental anguish due the feelings of threat and fright that the AUC might target them, too.

ii)    *The AUC tortured Plaintiffs and decedents as part of the role assigned to them by the Colombian State, to intimidate and deter them from supporting the FARC.*

298.    The AUC would often force its victims to disclose names of other potential guerrilla supporters.  They took workers from the plantations and tortured them to the point that many would invent stories and names in the hope that the paramilitaries would let them go.  Two union leaders reported that the paramilitaries would use tactics such as tying the worker's hands and feet, using chainsaws or pliers to break them to pieces, and pulling out their nails.  The AUC used torture against civilians to intimidate them from providing support to guerrillas, as part of their fight against the guerrillas on behalf of the government.  *See supra* ¶¶45–70 (state action). On information and belief, the torture of Plaintiffs and decedents was intended to accomplish this goal.

### G.  Seventh Claim for Relief – Cruel, Inhuman, or Degrading Treatment

299.    The allegations set forth in the above paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

66

300.    The acts of cruel, inhuman, or degrading treatment alleged herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law, the common law of the United States, the statutes and common law of New Jersey and the District of Columbia, and the laws of Colombia.

301.    The AUC committed acts of cruel, inhuman, or degrading treatment in that they inflicted mental or physical suffering, anguish, humiliation, fear, and debasement upon Plaintiffs and their decedents.  The acts described herein had the intent and the effect of grossly humiliating and debasing the Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and/or breaking their physical or moral resistance.  Plaintiffs were placed in great fear for their lives and were forced to suffer severe physical and psychological abuse and agony.

302.    The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the cruel, inhuman, and degrading treatment committed against Plaintiffs.

   i)   *The AUC inflicted mental and physical suffering, anguish, humiliation, fear and debasement on Plaintiffs and their decedents as part of the role assigned to them by the Colombian State, to intimidate and coerce civilians from supporting the FARC.*

303.    The AUC used cruel, inhuman, and degrading treatment against civilians to intimidate them from providing support to guerrillas, as part of their fight against the guerrillas on behalf of the government.  *See supra* ¶¶31–33, 45–70 (state action; atrocious acts of AUC).  Both decedents and surviving plaintiffs were victims of the AUC's cruel, inhuman, and degrading treatment.  *See supra* ¶¶134–164, 242–244 (Plaintiffs' Injuries; mental anguish of decedents and

survivors).  The AUC targeted Plaintiffs' decedents because their actions and positions in the community were seen as supporting the FARC.

### H. Eighth Claim for Relief – Violation of the Rights to Life, Liberty and Security of Person and Peaceful Assembly and Association

304.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

305.    The violations of the rights to life, liberty and security of person and peaceful assembly and association alleged herein constitute torts that give rise to federal jurisdiction under the Alien Tort Statute (28 U.S.C. § 1350), as well as violations of customary international law, the common law of the United States, the statutes and common law of New Jersey and the District of Columbia, and the laws of Colombia.

306.    The AUC violated Plaintiffs' and their decedents' rights to life, liberty and security of person and peaceful assembly and association in that they carried out 1) a systematic campaign of terror and violence 2) conceived and arbitrarily waged by state agents 3) hatched and calculated to suppress political opinion and expression.

307.    The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the violations of the rights to life, liberty and security of person and peaceful assembly and association committed against Plaintiffs.

i)   *Members of the AUC, as State agents and at the behest of State agents, carried out a systematic campaign of terror and violence.*

308.   The AUC carried out a campaign of terror and violence against civilians to intimidate them from providing support to guerrillas, as a central strategy of their fight against the guerrillas on behalf of the government.  *See supra* ¶¶31–33, 45–70 (atrocious acts of AUC; state action).

309.   Decedents were killed in the course of the AUC's terrorist campaign against civilian populations.

ii)   *The AUC's campaign was hatched and calculated to suppress any political activity or expression that could be suspected of association with support for the FARC.*

310.   One of the overriding purposes of the AUC's campaign of terror against civilians, including Plaintiffs and decedents, was to intimidate and coerce civilians in Urabá against supporting the FARC or, indeed, any political ideology that could be associated with the FARC. This could and often did include the violent suppression of any form of political or social organization activity outside of those forms specifically endorsed by the paramilitaries and the government.  *See supra* ¶¶26–34, 53–54 (goals and tactics of AUC)

311.   Decedents were killed to suppress their political expression and to prevent them and others from giving political support to the ideologies associated with the FARC.  *See supra* ¶¶ 134–163 (Plaintiffs' Injuries).

**I.   Ninth Claim for Relief – Consistent Pattern of Gross Violations of Internationally Recognized Human Rights**

312.   The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

313.   The consistent pattern of gross violations of internationally recognized human rights alleged herein constitutes torts that give rise to federal jurisdiction under the Alien Tort Statute

(28 U.S.C. § 1350), as well as violations of customary international law, the common law of the United States, the statutes and common law of New Jersey and the District of Columbia, and the laws of Colombia.

314.    The AUC carried out a consistent pattern of gross violations of internationally recognized human rights against Plaintiffs, their decedents, and others in that the above-described abuses against Plaintiffs and decedents occurred within the context of numerous similar abuses and killings.

315.    The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC, which was acting under color of law through its collaboration with the Colombian civilian government and military, to bring about the consistent pattern of gross violations of internationally recognized human rights committed against Plaintiffs.

   i)   *The AUC committed its acts of abuse against Plaintiffs and their decedents in the context of a consistent pattern of abuses.*

316.    The torture, murder, and other abuses committed against decedents, surviving Plaintiffs, and their family members was committed as part of and in the context of a consistent pattern of abuses that constitute gross violations of internationally recognized human rights.  These abuses include violations of the right to life, right to security of person, right to security of property, right to privacy, right to freedom of political expression and social organization, and many others.

317.    The specific acts constituting these violations include thousands of murders and incidents of torture and cruel, inhuman and degrading treatment, forced displacement, unwarranted

intrusions into the private medical information and decisions of banana workers, suppression of union activity and peaceful political dissidence. *See supra* ¶¶26–34, 53–55, 63–64, 104–105, 121 (AUC war strategy, State Department reports, control of medical services).

**J.   Tenth Claim for Relief – Wrongful Death**

318.   The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

319.   The acts described herein constitute wrongful death, actionable under the laws of New Jersey, the District of Columbia, the United States, and Colombia.

320.   The Defendant is liable to Plaintiffs 1) decedents died as a proximate result of the Decedent's acts and omissions and 2) decedents would have been able to maintain an action against the Decedent for damages resulting from their injuries had they survived.

321.   As a result of the deaths described above, Plaintiffs have sustained pecuniary loss resulting from the loss of society, comfort, attention, services, and support of the decedents.

322.   The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the wrongful deaths of the decedents.

*i)   The AUC caused decedents' deaths as a result of its overt acts of killing.*

323.   The AUC's intentional abduction and execution of decedents, as part of its campaign of terror against the civilians of Urabá, which was intentionally and knowingly supported by Chiquita, directly caused the the deaths of decedents. *See supra* ¶¶134–164 (Plaintiffs' Injuries).

ii)   *If decedents had not died, they would have been able to maintain an action for damages resulting from their injuries.*

324.    Decedents' injuries – both physical and emotional – were caused by intentional and negligent actions and omissions of Chiquita.  Had they not died, they could have maintained actions for damages against Chiquita under the laws of Colombia, New Jersey, the District of Columbia, the United States, and the law of nations.  Their surviving family members therefore may maintain an action for their wrongful death.

### K.  Eleventh Claim for Relief – Assault and Battery

325.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

326.    The acts described herein constitute assault and battery, actionable under the laws of New Jersey, the District of Columbia, the United States, and Colombia.

327.    Chiquita, the Decedent, and Non-Party Executives' actions alleged herein constitute assault and battery in that they 1) acted with the intention of causing offensive and harmful touching of Plaintiffs' or decedents' persons without their consent, and/or 2) they acted with the intention of creating the imminent apprehension that such touching would result, and 3) such touching or apprehension of touching resulted.

328.    As a result of these acts, Plaintiffs were placed in great fear for their lives and suffered severe physical and psychological abuse and agony.

329.    Chiquita, the Decedent, and Non-Party Executives' acts were willful, intentional, wanton, malicious, and oppressive.

330.    The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with,

confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the assault and battery of Plaintiffs and decedents.

   i)   *Members of the AUC attacked decedents intending to cause decedents to suffer harmful contacts or an imminent apprehension of an immediate harmful contact without their consent.*

331.   The AUC abducted and killed decedents, in some cases in front of Plaintiffs and their family members.  In so doing, the AUC intended to cause decedents to suffer dangerous, harmful, and offensive physical contact without their consent, and also to frighten them with the imminent apprehension of such contact, and they also intended to frighten surviving Plaintiffs with the imminent apprehension of such contact.  *See supra* ¶¶134–163 (Plaintiffs' injuries).

   ii)   *Decedents suffered harmful contacts or a reasonable, imminent apprehension of harmful contacts because of the AUC's attacks.*

332.   The AUC's acts of kidnapping, killing, and torture alleged herein included harmful physical contact that caused injury and death to decedents without their consent, and acts of physical and emotional intimidation that caused decedents and surviving Plaintiffs to suffer the fright and apprehension of immediate harmful physical contact.

   **L.   Twelfth Claim for Relief – Intentional Infliction of Emotional Distress**

333.   The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

334.   Chiquita, the Decedent, and Non-Party Executives' outrageous conduct constitutes the intentional infliction of emotional distress and is actionable under the laws of New Jersey, the District of Columbia, the United States, and Colombia.

335.     Chiquita, the Decedent, and Non-Party Executives' conduct alleged herein constitutes international infliction of emotion distress in that it 1) was intentional and/or reckless, 2) was extreme and outrageous, and 3) caused 4) severe distress to Plaintiffs and decedents.

336.     As a direct and proximate result of Chiquita, the Decedent, and Non-Party Executives' acts, Plaintiffs were placed in great fear for their lives and were forced to suffer severe physical and psychological abuse and agony.

337.     The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the intentional infliction of emotional distress of Plaintiffs and decedents.

   i)   *Chiquita, the Decedent, and Non-Party Executives acted intentionally and recklessly, with the intent and/or deliberate disregard of the high possibility that their support, assistance, direction, and collusion with the AUC would cause the acts alleged herein and cause severe humiliation, mental anguish, and emotional and physical distress.*

338.     By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Chiquita, the Decedent, and Non-Party Executives intentionally acted, with the intent and/or deliberate disregard of the high possibility that their conduct would lead to the abduction, torture, and killing of decedents, causing severe humiliation, mental anguish, and emotional distress to decedents, surviving Plaintiffs, and their families.  *See supra* ¶¶71–133 (Chiquita's support to the AUC; aiding and abetting; conspiracy; agency).

339.     At all relevant times, it was in Chiquita, the Decedent, and Non-Party Executives' power to cease their assistance, support, facilitation, condonation, and conspiracy with the AUC or to

prevent or prohibit such conduct, but instead they continued in their course of conduct

continuously from 1995 until at least 2004.

  ii)   Chiquita, the Decedent, and Non-Party Executives' *conduct was so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community, and was without privilege or justification.*

340.   Chiquita, the Decedent, and Non-Party Executives' conduct alleged herein violated the

laws of Colombia, New Jersey, the District of Columbia, and the United States, as well as the

law of nations.  War crimes, crimes against humanity, torture, extrajudicial killing, cruel,

inhuman and degrading treatment, violations of the right to life, liberty, security of person, and

peaceful assembly and expression, terrorism, material support of terrorism, and consistent

patterns of gross violations of internationally recognized human rights are acts that are so

heinous that they are considered to be of universal and mutual concern to all nations of the

world, such that nations have a legally binding obligation to punish and prevent them.  Chiquita,

the Decedent, and Non-Party Executives' complicity in such acts is therefore so extreme and

outrageous in character as to be completely unjustifiable and intolerable in a civilized

community.

  iii)   *Chiquita, the Decedent, and Non-Party Executives' actions in aiding, facilitating, paying, colluding with, and supporting the AUC caused Plaintiffs' and their decedents' distress.*

341.   By continuing to provide financial support, arms, and assistance in smuggling drugs, as

well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian

government's violent paramilitary campaign against civilians, Chiquita, the Decedent, and Non-

Party Executives proximately caused the injuries alleged in this complaint.  Their involvement in

the AUC's activities – including providing arms, money, and other assistance – began before

Plaintiffs' injuries were incurred and continued long after.  Chiquita, the Decedent, and Non-Party Executives' support foreseeably became a crucial component in the AUC's ability and motivation to attack Plaintiffs, decedents, and countless other civilians in Urabá.  *See supra* ¶¶71–98, 100–102 (Chiquita's assistance to the AUC; assistance was substantial)

iv) *The distress suffered by Plaintiffs is severe enough that no reasonable person could be expected to endure it.*

342.    The AUC's torture and execution of the decedents caused them severe mental and physical trauma prior to their deaths.  *See supra* ¶¶134–163 (Plaintiffs' Injuries).

343.    The AUC caused the surviving Plaintiffs severe mental and physical pain in witnessing or learning of the murder of their family members.  Individual Plaintiffs also experienced suffering in being threatened against pursuing an investigation of the death, being forced to flee the area, and feeling threatened and frightened that the AUC would also target them.  These fears, disturbances, and traumas constitute genuine and substantial distress, of a sort so severe that no person could reasonably be expected to endure it.

**M. Thirteenth Claim for Relief – Negligent Infliction of Emotional Distress**

344.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

345.    Chiquita, the Decedent, and Non-Party Executives' conduct constitutes the negligent infliction of emotional distress and is actionable under the laws of New Jersey, the District of Columbia, the United States, and Colombia.

346.    Chiquita, the Decedent, and Non-Party Executives' conduct constitutes negligent infliction of emotion distress in that 1) they owed Plaintiffs and decedents a duty to act with reasonable care, 2) they breached that duty, 3) emotional distress was reasonably foreseeable, 4)

Chiquita, the Decedent, and Non-Party Executives' conduct proximately caused the distress, and 5) the distress was genuine and substantial.

347.    As a direct and legal result of Chiquita, the Decedent, and Non-Party Executives' wrongful acts, Plaintiffs and decedents have suffered and will continue to suffer significant physical injury, pain and suffering, and extreme and severe mental anguish and emotional distress.

348.    The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in bringing about the negligent infliction of emotional distress of Plaintiffs and decedents.

   i)    *Chiquita, the Decedent, and Non-Party Executives breached their duty to Plaintiffs by failing to act so as to stop engaging in the conduct described herein, and by failing to take steps in their power to prevent or prohibit such conduct.*

349.    By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Chiquita, the Decedent, and Non-Party Executives breached their duty to Plaintiffs to act with reasonable care so as not to cause injury to them.  *See supra* ¶¶71–133 (Chiquita's support, aiding and abetting, conspiracy, agency)

350.    At all relevant times, it was in Chiquita, the Decedent, and Non-Party Executives' power to cease their assistance, support, facilitation, condonation, and conspiracy with the AUC or to prevent or prohibit such conduct, but instead they continued in their course of conduct continuously from 1995 until at least 2004.

*ii)   Chiquita, the Decedent, and Non-Party Executives' conduct alleged herein proximately caused Plaintiffs and decedents to suffer emotional distress so severe that no reasonable person could be expected to endure it.*

351.   By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Chiquita, the Decedent, and Non-Party Executives proximately caused the injuries alleged in this complaint.  Their involvement in the AUC's activities – including providing arms, money, and other assistance – began before Plaintiffs' injuries were incurred and continued long after.  Chiquita, the Decedent, and Non-Party Executives' support foreseeably became a crucial component in the AUC's ability and motivation to attack Plaintiffs, decedents, and countless other civilians in Urabá.  *See supra* ¶¶71–98, 100–102 (Chiquita's assistance to the AUC, assistance was substantial).

*iii)   At all relevant times, Chiquita, the Decedent, and Non-Party Executives knew that their conduct would and did proximately result in physical and emotional distress to the AUC's victims.*

352.   From the moment of their first involvement with paramilitary groups, Chiquita, the Decedent, and Non-Party Executives were aware that their assistance, collusion, facilitating, and support would result in the killing, torture, and other abuses committed against countless civilians in Urabá by the AUC.

353.   At all relevant times, paramilitary groups like the ACCU and the AUC were notorious for their brutal methods and tactic of declining to discriminate between combatants and civilians.  Their reputation and method were well known in general and to Chiquita in particular, and were the subject of any number of newspaper articles and investigations both in Colombia and abroad.  *See supra* ¶¶103 – 110 (Chiquita's knowledge).  Chiquita, the Decedent, and Non-Party Executives engaged the AUC to provide security, suppress union activity, and discourage FARC

support despite their prior knowledge that the paramilitaries in general – and the AUC in particular – used terrorism and violence against civilians as a strategy to carry out those goals. *See supra* ¶¶111–121 (Chiquita's intentional support).

354.    Despite their general knowledge about the paramilitaries' tactics and specific understanding of the paramilitaries' activities in Urabá, Chiquita, the Decedent, and Non-Party Executives specifically engaged, paid, facilitated, condoned, conspired with, and otherwise supported them to suppress union activity and discourage support of the FARC – the very activities for which their brutal tactics were notorious.  Chiquita, the Decedent, and Non-Party Executives played this role with the knowledge and intent that the paramilitaries would commit the abuses alleged herein, and they continued to play this role as it became clear that their support was assisting with the torture, murder, and other abuse of Chiquita, the Decedent, and Non-Party Executives' opponents.  *See supra* ¶¶103–121 (knowing and intentional assistance).

   iv)   *Plaintiffs' and decedents' distress was genuine and substantial.*

355.    The AUC's torture and execution of the decedents caused them severe mental and physical trauma prior to their deaths.  *See supra* ¶¶134 – 163, 242–244 (Plaintiffs' Injuries).

356.    The AUC caused the surviving Plaintiffs severe mental and physical pain in witnessing or learning of the murders of their family members.  Individual Plaintiffs also experienced suffering in being threatened against pursuing an investigation of the deaths, being forced to flee the area, and feeling threatened and frightened that the AUC would also target them.  These fears, disturbances, and traumas constitute genuine and substantial distress, of a sort so severe that no person could reasonably be expected to endure it.

### N. Fourteenth Claim for Relief – Negligence/Negligent Hiring/Negligence Per Se

357.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

358.    Chiquita, the Decedent, and Non-Party Executives' conduct constitutes negligence and is actionable under the laws of New Jersey, the District of Columbia, the United States, and Colombia.

359.    Chiquita, the Decedent, and Non-Party Executives' conduct constitutes negligence in that 1) they owed Plaintiffs and decedents a duty to act with reasonable care not to injure them, 2) they breached that duty, 3) it was reasonably foreseeable that their negligence would cause injury, damage, loss, or harm to Plaintiffs and their next of kin.

360.    Chiquita, the Decedent, and Non-Party Executives' negligent actions include, but are not limited to, unreasonably disregarding the risk that persons in their employ would commit torts against Plaintiffs and decedents, and violating statutes and other laws designed to protect Plaintiffs and decedents.

361.    As a result of these acts, Plaintiffs and decedents suffered harm including, but not limited to, death, physical injury, and severe emotional distress.

   i)   *Chiquita, the Decedent, and Non-Party Executives breached their duty to Plaintiffs by failing to act so as to stop engaging in the conduct described herein, and by failing to take steps in their power to prevent or prohibit such conduct.*

362.    By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and/or conspiring with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Chiquita, the Decedent, and Non-Party Executives breached their duty to Plaintiffs to act with reasonable care so as not to cause

injury to them.  *See supra* ¶¶71–133  (Chiquita's support, aiding and abetting, conspiracy, agency)

363.    At all relevant times, it was in Chiquita, the Decedent, and Non-Party Executives' power to cease their assistance, support, facilitation, condonation, and conspiracy with the AUC or to prevent or prohibit such conduct, but instead they continued in their course of conduct continuously from 1995 until at least 2004.

    ii)    *Chiquita, the Decedent, and Non-Party Executives' conduct alleged herein proximately caused Plaintiffs and decedents to suffer physical and emotional harm, including death.*

364.    By continuing to provide financial support, arms, and assistance in smuggling drugs, as well as facilitating, condoning, and conspiring with the AUC to carry out the Colombian government's violent paramilitary campaign against civilians, Chiquita, the Decedent, and Non-Party Executives proximately caused the injuries alleged in this complaint.  Their involvement in the AUC's activities – including providing arms, money, and other assistance – began before Plaintiffs' injuries were incurred and continued long after.  Chiquita, the Decedent, and Non-Party Executives' support foreseeably became a crucial component in the AUC's ability and motivation to attack Plaintiffs, decedents, and countless other civilians in Urabá.  *See supra* ¶¶71–98, 100–102 (Chiquita's support to the AUC, assistance was substantial).

    iii)    *At all relevant times, Chiquita, the Decedent, and Non-Party Executives knew that the AUC was an organization dedicated to the use of terrorism and violence against civilians and that it would use violence against perceived opponents of Chiquita, and could have foreseen that this could and would cause physical and mental harm to the AUC's victims.*

365.    From the moment of their first involvement with paramilitary groups, Chiquita, the Decedent, and Non-Party Executives were aware that their assistance, collusion, facilitation, and

support would result in the killing, torture, and other abuses committed against civilians in Urabá by the AUC.

366.    At all relevant times, paramilitary groups like the ACCU and the AUC were notorious for their brutal methods and tactic of declining to discriminate between combatants and civilians. Their reputation and method were well known in general and to Chiquita in particular, and were the subject of any number of newspaper articles and investigations both in Colombia and abroad. *See supra* ¶¶103 – 110 (Chiquita's knowledge).  Chiquita, the Decedent, and Non-Party Executives engaged the AUC to provide security, suppress union activity, and discourage FARC support despite their prior knowledge that the paramilitaries in general – and the AUC in particular – used terrorism and violence against civilians as a strategy to carry out those goals. *See supra* ¶¶111–121 (Chiquita's intentional support).

367.    Despite their general knowledge about the paramilitaries' tactics and specific understanding of the paramilitaries' activities in Urabá, Chiquita, the Decedent, and Non-Party Executives specifically engaged, paid, facilitated, condoned, conspired with, and otherwise supported them to suppress union activity and discourage support of the FARC – the very activities for which their brutal tactics were notorious.  Chiquita, the Decedent, and Non-Party Executives played this role with the knowledge and intent that the paramilitaries would commit the abuses alleged herein, and they continued to play this role as it became clear that their support was assisting with the torture, murder, and other abuse of Chiquita, the Decedent, and Non-Party Executives' opponents.  *See supra* ¶¶103–121 (knowing and intentional assistance).

   iv)    *The AUC's dedication to the use of terrorism and violence against civilians proximately caused Plaintiffs' and decedents' injuries.*

368.    It was the AUC's tactic of using terrorism and violence to intimidate civilians, suppress union activity, and discourage support of the FARC – with the assistance and collaboration of

Chiquita – that proximately caused the deaths of decedents and the mental and physical injuries to Plaintiffs.

> *v)*   *Chiquita, the Decedent, and Non-Party Executives' acts of material support to the AUC, along with its acts of assistance, support, direction, and collusion, violated laws designed to protect Plaintiffs and decedents, the violation of which constitutes negligence* per se.

369.    Chiquita, the Decedent, and Non-Party Executives' support of the AUC violated laws of the United States, Colombia, and New Jersey, the District of Columbia, as well as customary international law, which were meant to protect Plaintiffs and others.  These laws include the Alien Tort Statute and the Torture Victim Protection Act (28 U.S.C. § 1350), among other U.S. statutes, and Colombian statutes outlawing paramilitarism and implementing Colombia's international human rights obligations.  The violation of these laws was negligent and willful, therefore constituting negligence *per se*.

### O. Fifteenth Claim for Relief – Loss of Consortium

370.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

371.    Chiquita, the Decedent, and Non-Party Executives' conduct caused surviving Plaintiffs to suffer loss of consortium and is actionable under the laws of New Jersey, the District of Columbia, the United States, and Colombia.

372.    At all times prior to their deaths, the decedents noted above were faithful, loving, and dutiful spouses, parents, and children to the Plaintiffs who are their spouses, children, and parents, respectively.

373.    As a result of the acts of the Decedent, those Plaintiffs who are the spouses, children, and parents of the decedents have been deprived of the decedents' society, comfort, attention,

services, and support, all to their damage, in an amount to be proved at trial.  In addition, those Plaintiffs have suffered and incurred the expenses of funeral and burial for the decedents, in an amount to be proved at trial.

374.    The Defendant is liable to Plaintiffs because the Decedent aided and abetted, facilitated, condoned, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, were the principals of, and/or conspired with the AUC in causing Plaintiffs to suffer loss of consortium.

*i)    As a result of the murders of decedents by the AUC, Plaintiffs were deprived of their spouses', parents', and children's society, companionship, services, and support.*

375.    John Doe 1 lost the society, companionship, services, and support of his father, John Doe 2, when John Doe 2 was killed by the AUC.

376.    Jane Doe 1 lost the society, companionship, services, and support of her mother, Jane Doe 2, when Jane Doe 2 was killed by the AUC.

377.    Jane Doe 3 lost the consortium, society, comfort, attention, services, and support of her husband, John Doe 5, when John Doe 5 was killed by the AUC.

378.    Minor Does 1 – 4 and John Doe 6 lost the society, companionship, services, and support of their mother and wife, Jane Doe 4, when Jane Doe 4 was killed by the AUC.  John Doe 6 also lost the consortium of Jane Doe 4.

379.    John Doe 7 lost the society, companionship, services, and support of his son, John Doe 8, when John Doe 8 was killed by the AUC.

380.    Jane Doe 5 lost the society, companionship, services, and support of her husband, John Doe 9, when John Doe 9 was killed by the AUC.

381.    Jane Doe 6 lost the society, companionship, services, and support of her husband, John

Doe 10, when John Doe 10 was killed by the AUC.

382.    Jane Doe 7 lost the society, companionship, services, and support of her husband, John

Doe 11, when John Doe 11 was killed by the AUC.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## X.    PRAYER FOR RELIEF

WHEREFORE, each and every Plaintiff prays for judgment against each defendant in excess of

$75,000, as follows:

  (a) for compensatory damages, including general and special damages;

  (b) for punitive damages;

  (c) for injunctive and declaratory relief as this Court deems appropriate;

  (d) for disgorgement of profits;

  **(e)** for costs of suit, attorneys fees and such other relief as the Court deems just and proper.

## XI.    JURY TRIAL DEMAND

383.    Plaintiffs hereby demand a jury trial on all issues so triable.

## XII.    VERIFICATION

On behalf of John Doe et al. Plaintiffs, I do solemnly declare and affirm under penalty of perjury

that the contents of the foregoing Complaint are true and correct to the best of my knowledge,

information, and belief.


Executed on:            September 29, 2015            Respectfully submitted,

_Marco Simons_
_____

Marco Simons [D.D.C. Bar No. 492713]

85

Counsel for Plaintiffs

Jonathan Kaufman
Marissa Vahlsing
Michelle Harrison
**EarthRights International**
1612 K Street NW #401
Washington, DC 20006
Tel: 202-466-5188

Agnieszka M. Fryszman
Benjamin D. Brown
**Cohen Milstein Sellers & Toll, PLLC**
1100 New York Ave., N.W.,
West Tower, Suite 500
Washington, D.C. 20005-3964
Tel: 202-408-4600
Fax: 202-408-4634

Paul L. Hoffman
**Schonbrun DeSimone Seplow Harris & Hoffman LLP**
723 Ocean Front Walk
Venice, CA 90291
Tel: 310-396-0731
Fax: 310-399-7040

Judith Brown Chomsky
**Law Offices of Judith Brown Chomsky**
Post Office Box 29726
Elkins Park, PA 19027
Tel: 215-782-8367
 Fax: 202-782-8368

Arturo Carrillo
**Colombian Institute of International Law**
5425 Connecticut Ave., N.W., #219
Washington, D.C. 20015
Tel: 202-994-5794